BRUNSWICK CORPORATION, Plaintiff-Appellee,

v.

STEEL WAREHOUSE CO., Inc., Defendant-Appellant.

No. 13688.

United States Court of Appeals Seventh Circuit.

Oct. 10, 1962.

Rehearing Denied Nov. 21, 1962.

Rehearing Denied Nov. 21, 1962, en banc.

John J. Faissler, Wayne R. Hannah, Jr., Chicago, Ill.; Sonnenschein, Lautmann, Levinson, Rieser, Carlin & Nath, Chicago, Ill., of counsel, for defendant-appellant.

Erwin C. Heininger, Patrick W. O'Brien, Chicago, Ill., Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel, for plaintiff-appellee.

Before HASTINGS, Chief Judge, and DUFFY and SCHNACKENBERG, Circuit Judges.

DUFFY, Circuit Judge.

Plaintiff is a Delaware corporation with its principal place of business at Chicago, Illinois. Defendant is an Indiana corporation with its principal place of business at South Bend, Indiana. Spincraft, Inc. of Milwaukee, Wisconsin, was one of plaintiff's suppliers.

This suit arises from a purchase from Spincraft, Inc. by defendant Steel Warehouse Co. of approximately 900,000 pounds of steel sheets in November 1959. Plaintiff claims there were no warranties made or given to Steel Warehouse Co. and that Steel Warehouse Co. breached the contract by not paying for the steel at the agreed price.

Defendant Steel Warehouse Co. denied it breached the contract, and in a counterclaim alleged the steel sheets were warranted by plaintiff to be 11 gauge, hot

rolled, pickled and oiled, commercial quality, prime, clean, flat, low carbon with no laminations and no rust, and that the steel sold failed to live up to such specifications.

The complaint alleged that in the fall of 1959, during the pendency of a steel strike, plaintiff authorized Spincraft, Inc. to purchase steel sheets of various sizes all smaller than those ordinarily used in the manufacture of parts for plaintiff; that more than 500 tons of such steel sheets were purchased at a cost of $112,-673.78 or over $10 per cwt. The complaint further alleged that the steel sheets thus purchased could not economically be used, and plaintiff authorized Spincraft, Inc. to sell said steel sheets. That on or about November 20, 1959, defendant verbally agreed to purchase said steel sheets at $8.85 per cwt. and Spincraft, Inc. agreed to sell to defendant at that price.

The jury found the issues for the plaintiff Brunswick and assessed damages at $46,592.80. On the counterclaim, the jury also found the issues in favor of plaintiff Brunswick.

Plaintiff is not a dealer or warehouser of steel. It is a manufacturer which bought the steel to be incorporated into its products. Spincraft had been manufacturing elevator wheels for the Brunswick bowling machine. Due to the steel strike it was unable to purchase the size of steel sheets customarily used. The steel "circles" which plaintiff ordinarily purchased from the mills were not available from any source. Spincraft welded the smaller sized sheets together and attempted to produce pin setter wheels from the welded material. These efforts were unsuccessful. The proofs showed the welds would not stand up. Brunswick requested Spincraft to sell the steel sheets as early as possible.

Actually, it was plaintiff's assignor Spincraft who sold the steel sheets to defendant. However, the rights and liabilities of Spincraft, Inc. insofar as the issues in this case are concerned, were assumed by plaintiff Brunswick. At times throughout the briefs, Brunswick is referred to when the transaction referred to was actually carried on by Spincraft.

The steel sheets which plaintiff was unable to use were segregated and piled near one of Spincraft's loading doors. They remained there until a portion thereof was later picked up by defendant.

The defendant learned that these sheets of steel were available and contacted Spincraft by telephone and talked to Ralph Fink, the vice president of Spincraft in charge of finance. Without inspecting the steel, defendant agreed to pay $8.85 cwt. and agreed to assume the burden and the expense of removing the lot from Spincraft's factory in Milwaukee. About 900,000 pounds of steel were involved. Exact weights were to be ascertained after the steel was loaded upon trucks.

There is a sharp conflict in the testimony as to just what was said in the telephone conversations. The president of defendant testified that Fink, in the first telephone conversation, said he had 450 tons of 11 gauge, hot rolled, pickled and oiled, commercial quality steel, and that in a subsequent conversation he told Fink that they were buying hot rolled, pickled and oiled, commercial quality steel, free from rust, no laminations, flat and clean.

Fink testified he told the defendant that the lot of steel sheets had been purchased by Spincraft as 11 gauge, hot rolled steel; that some of it was pickled and the balance of about 78,000 pounds was at a steel pickling plant in Chicago; that some of it was material which had been purchased by Otis Elevator Company from sources in the eastern part of the country with which Spincraft would not normally have dealings. Fink testified Spincraft had purchased the material as 11 gauge, hot rolled, pickled and oiled steel and apparently that Otis had done the same, but that he was in no position to guarantee it in any shape or manner and would not make any kind of representations or warranties.

Defendant prepared a purchase order dated November 24, 1959. It described

the steel as 11 GA. HRPO CQ Prime Steel $8.85/cwt; the order also stated: "This material must be prime, clean, flat, low carbon, no laminations and no rust."

In a letter bearing the date of December 3, 1959, Fink wrote to defendant as follows:

"We received your Purchase Order 9538 in today's mail, December 2.

"Your attention is called to the statement: 'This material must be prime, clean, flat, low carbon, no laminations, no rust.'

"In the discussions preceding your verbal order's release to us, some (but not all) of these points were covered. I can but repeat what you were told then—this material was purchased by us under the expectation that it was all that you now expect it to be. No warranties of this kind were made to us—none can therefore be made to you. You must therefore accept this material on the basis outlined and as previously given you verbally."

Defendant argues that the substantive law of Wisconsin applies, and that under Wisconsin law, where goods are sold by description, there is an implied warranty that the goods shall correspond with the description. Defendant claims it was error for the District Court to refuse to submit the case to the jury on defendant's theory that there was a breach of implied warranty.

■ Defendant refers to "implied warranty" as its "basic" defense. But interestingly enough, the defendant never mentioned the phrase "implied warranty" in its pleadings. In truth, the basic issue in this lawsuit was defendant's claim denied by plaintiff, that plaintiff breached its contract to sell prime, 11 gauge steel sheets as hereinbefore specifically described.

■ The sharp conflict in the testimony as to the terms of the sale was resolved by the jury in favor of the plaintiff. The jury believed Fink that the sale was an "as is" sale and without warran-

ties. That being the case, the Wisconsin law of implied warranties had no application. We find no error as to the manner in which this question was submitted to the jury.

The other issues raised by defendant relate to the question of damages. Steel from the lot sold was removed by truck from Spincraft's factory in Milwaukee commencing November 27, 1959. The last load was picked up January 14, 1960. The total amount removed by defendant was 482,900 pounds. Invoices totaling $42,736.15 were sent to defendant in December 1959 and January 1960. On December 29, 1959, defendant paid $15,000 to plaintiff "on account." All but 127,270 pounds of steel removed by defendant was resold by it between November 27, 1959 and April 29, 1960 for the total sum of $40,030.78. These resales were at prices higher than the contract price with Spincraft.

On January 5, 1960, the steel strike was settled. On January 14, 1960, the same date as defendant's last pickup of steel, defendant's treasurer, Siegel, wrote to plaintiff referring to the terms of the purchase order and complained that some of the material was 10 gauge rather than 11 gauge. Fink responded by referring to his letter of December 3, 1959, and demanded that the balance of the steel be removed at once and accused Siegel of breaking his promise of prompt payment. On January 21, 1960, Siegel answered saying, among other things, " * * * [W]e are hereby canceling the balance."

The steel which defendant did not remove from Spincraft's plant amounted to 412,590 pounds. After the complaint in the instant suit was filed, it was resold to Frank W. Ladky Associates. Plaintiff also negotiated a resale of steel sheets amounting to 127,200 pounds which defendant had removed to its warehouse but had not resold. This steel was taken from defendant's warehouse seven months after this lawsuit had been commenced. To obtain this steel, plaintiff delivered to defendant a letter approved before hand by the defendant's counsel, saying that the steel was received by

Brunswick Corporation without prejudice to the claims of either party in the pending lawsuit "or to the amount which should be credited to you for the steel hereby received."

The total amount received by plaintiff upon the resale of the steel was $19,833.-40. In calculating its claim for damage, plaintiff subtracted this sum together with the $15,000 paid on account, from the agreed purchase price and claimed the balance as the amount of damages. This calculation was apparently adopted by the jury.

 Defendant argues that the Court submitted an incorrect instruction to the jury pertaining to the measure of damages. Defendant argues the correct measure of damages was the difference between the contract price and the fair market value at the time of the breach. This might well be the test in a case where the goods had not been accepted. Howse v. Crumb, 143 Colo. 90, 352 P.2d 285, 81 A.L.R.2d 1350 (1960). But that is not the case before us.

In order to find for the plaintiff, the jury had to find under the Court's instructions that the entire lot of steel sheets had been "delivered" to the defendant. Furthermore, the pertinent Wisconsin Statute (Chap. 121 Wis.Stat. sec. 48), provides that goods are "accepted" when the buyer does any act in relation to them which is inconsistent with ownership in the seller. It is undisputed in this record that between November 27, 1959 and April 29, 1960, defendant resold 355,610 pounds of the 482,900 pounds of steel sheets which had been picked up between November 27, 1959 and January 14, 1960.

We hold that under the facts in this case, defendant accepted the whole lot sold to it including the portion which defendant had not picked up. Pertinent is a decision of this Court in Moscahlades Bros., Inc. v. Mallars & Company, 7 Cir., 263 F.2d 631. There, we applied the provisions of the Uniform Sales Act. A 25 case lot was involved. We held the conduct of the buyer in withdrawing and

selling two cases from the 25 case lot was inconsistent with ownership in the plaintiff, and hence the entire lot of 25 cases had been accepted.

Defendant has urged other errors in the trial of this case, and we have carefully considered same. We do not deem any of them to be prejudicial.

The judgment of the District Court is affirmed.