**MEAT REQUIREMENTS COORDINATION, INC., Appellee,**

v.

**GGO, INC., Appellant.**

No. 81–1669.

United States Court of Appeals, Eighth Circuit.

Submitted March 8, 1982.

Decided March 15, 1982.

Rehearing Denied April 8, 1982.

Popkin, Stern, Heifetz, Lurie, Sheehan, Reby & Chervitz, Pat L. Simons, N. Kimasa Sindel, Clayton, Mo., for appellant.

Smith, Nutty, Sharp & Benson, Dale Sharp, Ames, Iowa, for appellee.

Before HEANEY, BRIGHT and HENLEY, Circuit Judges.

BRIGHT, Circuit Judge.

GGO, Inc., appeals from an adverse judgment in this action instituted by Meat Re-

quirements Coordination, Inc. (MRC). MRC successfully sought to recover money from its sale of frozen beef trimmings to GGO. As buyer, GGO maintains that the terms of its purchase contract with MRC allocated the risk of loss to MRC, the seller. As a consequence, GGO argues that it was absolved from liability for payment once it revoked its acceptance of the meat. In addition, GGO asserts that the terms of the contract entitle it to the attorneys' fees that it incurred in protecting its rights in this action. We reject GGO's contentions and, accordingly, affirm.[1]

MRC and GGO, both meat brokers, traded extensively with each other during 1977. They developed a pattern of trading through telephone conversations. Following these conversations, GGO would send MRC written purchase orders, which contained additional contract proposals on the reverse side. MRC did not object to these additional terms, and followed GGO's written purchase orders with its own written confirmation of the kind, quantity, and date of delivery of the meat. MRC generally would deliver the meat to GGO by transferring title while the goods remained in storage.

This general pattern of conduct accompanied the transaction in question. On September 13, 1977, GGO and MRC conducted telephone conversations concerning the purchase of 38,000 pounds of boneless beef trimmings. On about the same date, GGO sent MRC its purchase order, which contained its standard terms and conditions on the reverse side. MRC then sent GGO its confirmation and transferred title to the meat in storage to GGO. GGO did not inspect the meat, but the record indicates that the meat was inspected before it left storage, at GGO's direction, for delivery to

an Armour & Company packing plant in Wisconsin. On September 23, 1977, Armour inspected 4,300 pounds of the 38,000 pound load to determine whether it met the fat content specifications of its contract with GGO. While Armour's inspection indicated that the meat was in excellent condition, it nevertheless rejected the uninspected portion of the load because the meat did not satisfy the requirements of Armour's contract with GGO.[2]

The portion of the load Armour rejected remained at the Armour facility until September 29, when GGO shipped it to Illinois. From there it was shipped to Kelly Foods in Tennessee on October 3, 1977. Kelly rejected the load as "old," and on October 5, 1977, GGO informed MRC of the condition of the meat. GGO placed the load in storage, and on November 9, 1977, United States Department of Agriculture (USDA) officials examined it. The USDA impounded the meat, and on November 22, 1977, GGO formally revoked its acceptance of the meat and requested directions from MRC for its disposition. On January 23, 1978, MRC informed GGO that it refused responsibility for the meat. GGO eventually reprocessed the meat after considerable expense in transportation and storage.

MRC instituted this action after GGO refused to pay the contract price of the meat. GGO claimed that MRC had breached its implied warranty of merchantability and asserted the right to set off the expenses it incurred in disposing of the meat as well as the right to attorneys' fees. The magistrate rejected both these claims and GGO appealed.

On appeal, GGO asserts that the provisions in its purchase order became part of the contract with MRC, thereby allocating to MRC the risk of loss for the spoiled beef

---

1. Jurisdiction in the case rests on diversity of citizenship and the requisite amount in controversy. 28 U.S.C. § 1332 (1976). The parties agree that Iowa law governs this action. Following a trial before United States Magistrate R. E. Longstaff, pursuant to 28 U.S.C.A. § 636(c) (West Supp.1981), judgment was entered in the United States District Court for the Southern District of Iowa. GGO thereafter

brought this appeal from the judgment. *See* 28 U.S.C.A. § 636(c)(3) (West Supp.1981).

2. Armour's contract with GGO called for the delivery of beef trimmings with a minimum 60%-chemical-lean content. MRC's agreement with GGO required a fat content of only 50%-chemical-lean. Armour's laboratory tests disclosed a fat content of 50.75%-chemical-lean.

and entitling GGO to attorneys' fees. In support of its argument that MRC bore the risk of loss, GGO relies on the following provisions from its purchase order:

1. All products, when delivered, are warranted by Seller [MRC] to conform to specifications and descriptions and, where applicable, are guaranteed to pass BAI inspection. This and all other warranties, express or implied, are made not only for the benefit of Purchaser [GGO], but also for the benefit of all persons to whom the product may subsequently be sold.

\* \* \* \* \* \*

3. Regardless of the terms of shipment or price Purchaser [GGO] has the right to inspect the product prior to acceptance or payment. Any act of acceptance prior to inspection shall be revocable, and the warranties applicable to this purchase shall not be waived by inspection. Purchaser [GGO] is authorized, but not obligated, to obtain certificates or written reports of inspection of the product from applicable governmental agencies at any time after the product leaves the possession of the Seller [MRC], and such certificates or reports shall be prima facie evidence of their authenticity and of the accuracy of their contents. Upon notice by Purchaser [GGO] to Seller [MRC] of rejection of products or any part thereof, Seller [MRC] shall then bear the risk of loss for the rejected product.

GGO contends that the terms contained in its purchase order permitted it to shift the risk of loss to MRC by revoking its acceptance after the USDA inspection disclosed that the meat was spoiled. We do not believe that the terms of the purchase order can be interpreted to shift the risk of loss to MRC under these circumstances.

While parties are free to alter the effect of the Uniform Commercial Code by contract, Iowa Code Ann. § 554.1102(3) (1967) (UCC § 1–102(3)), none of the terms of GGO's purchase order purports to dis-

place the requirements of the Uniform Commercial Code governing timely revocation of acceptance.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it. [Iowa Code Ann. § 554.-2608(2) (1967) (UCC § 2–608(2)).]

The reference in the purchase order permitting GGO "to obtain certificates or written reports of inspection of the product from applicable governmental agencies *at any time* after the product leaves the possession of the Seller," (emphasis added) does not relieve GGO of its duties to conduct its own inspection within a reasonable time to discover defects in the product and to revoke acceptance before a substantial change in the condition of the goods occurs. *See* Iowa Code Ann. § 554.2608(2) (1967) (UCC § 2–608(2)).

Here, the magistrate found that the beef trimmings were in excellent condition when delivered to GGO. The magistrate further found that the spoilage occurred as a result of mishandling the meat after Armour inspected the meat for fat content and rejected the load. Under these circumstances, neither the terms of GGO's purchase order, nor the Uniform Commercial Code, permits GGO to shift the risk of loss to MRC. Comment to section 2–608 of the Uniform Commercial Code states: "[t]he buyer may not revoke his acceptance if the goods have materially deteriorated except by reason of their own defects." Iowa Code Ann. § 554.2608, comment 6.

In addition, paragraph 3 of the purchase order, which provides that "[u]pon notice by Purchaser [GGO] to Seller [MRC] of rejection of products or any part thereof, Seller shall then bear the risk of loss for the rejected product[,]" would not shift the risk of loss to MRC in this case. This provision governs the rejection of goods, not revocation of acceptance. Once goods have been

accepted they can no longer be rejected. *See* Iowa Code Ann. § 554.2607(2) (1967) (UCC § 2–607(2)). GGO has never contended that it did not accept the meat. Thus, any rights it may have against MRC must be based on its right to revoke acceptance, which we have already determined adversely to it.

Accordingly, we conclude that even if the terms of GGO's purchase order became part of its contract with MRC, those terms did not shift the risk of loss to MRC for deterioration of the meat that occurred after GGO accepted the goods and after GGO had a reasonable opportunity to inspect the meat.

■ GGO next asserts that the following provision in its purchase order entitles it to the attorneys' fees it incurred in defending this action:

6. In the event of Seller's [MRC's] default hereunder, Purchaser [GGO] shall be entitled to recover reasonable attorneys' fees incurred in enforcing or protecting Purchaser's [GGO's] rights, whether by suit or otherwise as well as any and all damages resulting from said default.

The magistrate concluded that if this term became part of the contract it entitled GGO to recover attorneys' fees only if GGO established MRC's default. Because GGO failed to prove that MRC breached its implied warranty of merchantability, the magistrate determined that GGO could not recover attorneys' fees. We agree with this interpretation.

Accordingly, we affirm the judgment of the district court.