BADGER PRODUCE COMPANY, INC., a
Wisconsin corporation, Plaintiff-Appellant,

v.

PRELUDE FOODS INTERNATIONAL, INC.,
Defendant-Respondent.

Court of Appeals

*No. 84–2000. Submitted on briefs November 22, 1985.—
Decided March 13, 1986.*

(Also reported in 387 N.W.2d 98.)

For the plaintiff-appellant the cause was submitted on the briefs of *Margaret M. Baumgartner* and *Goldberg & Woods, S.C.,* of Madison.

For the defendant-respondent the cause was submitted on the brief of *Lee R. Atterbury* and *Johnson, Swingen, Atterbury & Riley, S.C.,* of Madison.

Before Gartzke, P.J., Dykman, J. and Eich, J.

DYKMAN, J.   Badger Produce Company, Inc. appeals from a judgment against Prelude Foods International, Inc. in an amount less than claimed in its complaint. The issues are: (1) whether there was sufficient

evidence to support the court's finding that a portion of the goods sold by Badger did not conform to contract specifications; (2) whether Prelude accepted the allegedly nonconforming goods and, if not; (3) whether Prelude gave effective notice of rejection. We conclude that there is sufficient evidence to support the court's finding that the goods were nonconforming. We also conclude that Prelude rejected the goods in question and gave adequate notice of the rejection. Therefore, we affirm.

## FACTS

Badger is a poultry and seafood jobber in Madison. Prelude is a seafood wholesaler in Newport, Rhode Island. On April 9, 1982, Badger agreed to sell Prelude two lots of frozen crab described as "number one broken Bairdi—claw off clusters." Each lot consisted of 500 twenty-pound boxes at a price of $2.68 per pound, due in 30 days, FOB Madison.

Stoller Fisheries, one of Prelude's customers, picked up all 1,000 boxes on April 13, 1982 and delivered them to an independent cold storage facility in Philadelphia. Within a few days, Prelude transferred one 500-box lot to Winter Seafood and the other to Sam Rust Seafood, to whom they had been "presold." These were paper transactions. The crab remained in storage in Philadelphia until Rust took possession of its lot and Winter sold and transferred 75 of its boxes to Flagg Seafood in New Jersey.

About April 16, 1982, Winter rejected its 500-box lot. In early May, Prelude notified Badger of this rejection, claiming the crab did not meet contract specifications. It told Badger where the lot was, including the

75 boxes shipped to Flagg. On May 25, 1982, Prelude transferred the 425 boxes remaining in Philadelphia into Badger's name and refused to pay for them.

Rust complained to Badger about its shipment but elected to keep the goods. On or about June 9, 1982, Prelude paid Badger $20,653.35.[1]

Badger sued Prelude for $32,946.65 due on the sale. Prelude counterclaimed for breach of express warranty, breach of implied warranty of merchantability, and for lost profits. After filing suit, Badger recovered the 425 boxes from Philadelphia, paid accrued shipping and storage fees, and resold them as a poorer grade of crab for $15,215.00. It did not attempt to recover the 75 boxes in New Jersey.

At trial, the only witnesses were Badger President Charles Gordon and Prelude President John McGeough. From their testimony the court found that the goods failed to conform to the contract description; that the goods were inspected by both Winter and Rust prior to any payment by Prelude; that Prelude cancelled the transaction regarding 500 boxes, but accepted the other 500; that Prelude lost profits of $.021 per pound on the 500 rejected boxes; and that Badger resold the 425 boxes it recovered for $15,215.00. The court held that Badger had breached an express warranty and an implied warranty of merchantability and that Prelude had given reasonable notice of the breach. The court held that Badger was entitled to the purchase price of $26,800.00 for the 500 boxes accepted, less the $20,653.35 already paid and less Prelude's $21,100.00

---

[1] This amount reflects a setoff claimed at trial by Prelude from a previous, unrelated transaction with Badger. Because Prelude failed to include the setoff claim in its pleadings, the trial court disallowed it. Prelude has not cross-appealed.

lost profits from the goods rightfully rejected, or a total of $4,046.65. Badger appeals.

## EVIDENCE OF BREACH

The first claimed error is that the trial court allowed hearsay concerning customer complaints for the purpose of establishing the quality of the goods. The only evidence supporting the claimed breach of warranty is McGeough's testimony regarding Prelude's customers' complaints and his inspection of the Flagg shipment in October, 1982. Badger argues that, without the evidence of customer complaints, McGeough's testimony regarding his own inspection of the crab is insufficient proof that the goods did not conform to contract description.

### (1) *Hearsay*

A decision on the admissibility of hearsay evidence is within the discretion of the trial court. *Christensen v. Economy Fire & Casualty Co.*, 77 Wis. 2d 50, 55, 252 N.W.2d 81, 84 (1977). We will uphold the exercise of such discretion "unless the record shows that the ruling was manifestly wrong and an abuse of discretion." (Footnote omitted.) *Muller v. State*, 94 Wis. 2d 450, 465–66, 289 N.W.2d 570, 578 (1980).

The testimony regarding customer complaints was admitted only to show that the complaints were made and that Prelude acted in response to them. It was not

used to establish that the crab was substandard.[2] The testimony was admissible. Section 908.01, Stats.[3] The court did not abuse its discretion.

## (2) *Sufficiency of Evidence*

McGeough testified that the boxes of crab he inspected in October, 1982 contained a higher percentage of shoulders than are permitted in a "grade one" product. Shoulders have little commercial value. He also stated that there was an unacceptably high percentage of broken legs and that the crabmeat was largely dehydrated. Badger contends that, given the handling of the shipment and the "semi-perishable" nature of the product, McGeough's testimony regarding his inspection of the Flagg sub-shipment five months after delivery was insufficient alone to establish the condition of the goods in April. Badger makes no connection between the passage of time and the alleged excess of unsaleable shoulders.

---

[2] Even if the testimony regarding customer complaints was erroneously admitted, the presence of other evidence to support the court's conclusion renders that error harmless. *Plainse v. Engle,* 262 Wis. 506, 520, 56 N.W.2d 89, 96, *modified,* 262 Wis. 522a, 57 N.W.2d 586 (1953).

[3] Section 908.01(3), Stats., provides:

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted.* (Emphasis added.)

*See also Auseth v. Farmers Mut. Automobile Ins. Co.,* 8 Wis. 2d 627, 629, 99 N.W.2d 700, 701 (1959) (testimony of third-party statement admissible over objection when not elicited to prove the truth of the matter asserted therein, but merely that the statement was made and its effect.)

McGeough's testimony established him as an experienced dealer in crabmeat. He was qualified to render an opinion as to the quality of the goods. *See Black v. General Electric Co.,* 89 Wis. 2d 195, 212, 278 N.W.2d 224, 231 (Ct.App. 1979) (lay opinion valid when based upon expertise gained from experience). The elapsed time before McGeough's inspection goes only to the weight to be given his testimony. That weight is for the factfinder. *Thompson v. Village of Hales Corners,* 115 Wis. 2d 289, 318, 340 N.W.2d 704, 718 (1983).

The court also heard Gordon's testimony to the effect that he had inspected the goods at Badger's warehouse before delivery and that their "condition was fine."[4] Again, however, the weight and credibility given this testimony is solely the province of the trial court. *Id.*

■

Because we conclude that the court's finding that the Winter lot was substandard is not clearly erroneous, we will not upset it.

## ACCEPTANCE OF GOODS

Badger contends that the trial court's determination that Prelude had not accepted the 500 boxes earmarked for Winter was erroneous. First, Badger argues that Prelude's acceptance of the lot sold to Rust constituted acceptance of the entire 1,000-box shipment under sec. 402.606(2), Stats.[5] Second, it maintains

---

[4] The record shows, however, that Gordon could not recall specific percentages of parts and breakage present at delivery.

[5] Section 402.606(2), Stats., provides:

that Prelude accepted the lot by reselling it to Winter, an act inconsistent with Badger's ownership of the goods under sec. 402.606(1). [6]

These arguments present mixed questions of fact and law. We apply the clearly erroneous standard to the court's findings of fact. *Noll v. Dimiceli's, Inc.,* 115 Wis. 2d 641, 643, 340 N.W.2d 575, 577 (Ct.App. 1983). If we accept the trial court's findings, we review *de novo* the application of the statutory standards to those facts. *Midwest Developers v. Goma Corp.,* 121 Wis. 2d 632, 651, 360 N.W.2d 554, 564 (Ct.App. 1984).

## (1) *Commercial Units*

Badger contends that because Prelude accepted part of the shipment—the 500-box lot sold to Rust—sec. 402.606(2), Stats., compels the conclusion that Prelude accepted the entire shipment. We disagree.

Badger's argument requires the definition of "commercial unit" to encompass the entire shipment. A "commercial unit" is a

> unit of goods as by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use. A commercial unit may be a single article (as a machine) or a set of articles (as a suite of furniture or an assortment of sizes) or a quantity (as a bale, gross, or carload) or any other unit

Acceptance of a part of any commercial unit is acceptance of that entire unit.

[6] Section 402.606(1)(c), Stats., provides in part:

(1) Acceptance of goods occurs when the buyer: . . . .

(c) Does any act inconsistent with the seller's ownership. . . .

treated in use or in the relevant market as a single whole.

Section 402.105(1)(a), Stats.

We cannot interpret "commercial unit" as expansively as Badger urges.[7] Prelude's two orders specified 500 boxes each. The "box" is the appropriate commercial unit. Because the boxes are fungible, division of a 1,000-box shipment into smaller groups of boxes would not impair the goods' essential "character or value on the market or in use." Section 402.105(1)(a), Stats. However, the opening and division of the contents of an individual box of frozen produce *could* have that effect.

A shipment of 1,000 boxes of frozen crab does not constitute a commercial unit. Prelude did not accept the entire shipment by accepting 500 boxes.

## (2) *Resale*

The trial court found that the goods had been "presold" to Winter and Rust, and were transferred to them from storage in Philadelphia. These findings are not clearly erroneous.

Ordinarily, if goods are resold after delivery, a buyer is presumed to have accepted them. 4 Anderson, *Uniform Commercial Code,* § 2–606:24 at 107 (3d Ed. 1983). However, the reselling of goods *before* delivery

---

[7] Badger cites *Brunswick Corporation v. Steel Warehouse Co.,* 309 F.2d 297 (7th Cir. 1962), for the proposition that where a buyer accepts a portion of a tendered lot of goods, he accepts the whole lot. This case appeared before the U.C.C. and the parallel provisions of the Wisconsin statutes incorporated specific definitions of "commercial unit" and "lot." We do not find it persuasive authority.

is not inconsistent with the seller's ownership because the buyer could not know at that time whether the goods were nonconforming. *Jacob Hartz Seed Co., Inc. v. Coleman,* 612 S.W.2d 91, 92 (Ark. 1981). Preselling does not result in "preacceptance." There must be a reasonable opportunity to discover defects in the goods before a buyer is held to have accepted them.

Badger contends that Prelude had reasonable opportunities to inspect both at Madison and before transferring the goods from storage in Philadelphia. Badger argues that, since Prelude availed itself of neither opportunity, it waived its right to inspect the goods under sec. 402.513, Stats.,[8] and accepted them upon their transfer to Winter and Rust.

The cases cited by Badger in support of this argument deal with circumstances in which either the defect in the goods was latent or the buyer had a reasonable opportunity to inspect prior to resale. Because there is no contention that the defect in the crab was latent, the only issue is whether the inspection opportunities cited by Badger were reasonable.

"Reasonableness" is a legal conclusion so "intertwined" with factual findings as to require us to "give weight to the trial court's decision, although the trial court's decision is not controlling." *Wassenaar v. Panos,* 111 Wis. 2d 518, 525, 331 N.W.2d 357, 361 (1983). The trial court held that inspection at Badger's Madison

---

[8] Section 402.513, Stats., provides in part:

(1) Unless otherwise agreed . . . where goods are tendered or delivered or identified to the contract for sale, the buyer has a right before payment or acceptance to inspect them at any reasonable place and time and in any reasonable manner. When the seller is required or authorized to send the goods to the buyer, the inspection may be after their arrival.

dock before shipment would have been reasonable. Nonetheless, its conclusion that Prelude rejected the Winter lot necessarily implies that the deferral of inspection until the goods reached Prelude's customers was equally reasonable.[9]

There is no evidence that Stoller Fisheries' drivers had express or implied authority to act as Prelude's agents to inspect or accept the goods in Madison. There is also no proof that Prelude routinely inspected goods at intermediate transshipment points. Anderson notes that

> [w]here goods are purchased for resale in the original containers, and to the knowledge of the seller are to be shipped directly to his buyer's customers . . . examination may be deferred until the goods have been received by the buyer's customers, and are taken out of the containers for sale or use. [Footnote omitted.] 4 Anderson, *supra,* § 2–513:33 at 34. We think this is a reasonable rule for interstate jobbing of closed containers of frozen foods.

The goods were not shipped directly to Prelude's customers. However, Prelude never had physical possession of the goods, making all intermediate transfers by paper transaction. The trial court found that such procedures are typical in the trade of frozen produce

---

[9] Badger argues that Prelude cannot rely upon an inspection by third parties, citing *Meat Requirements Coordination, Inc. v. GGO, Inc.,* 673 F.2d 229 (8th Cir. 1982). However, in *GGO* the buyer admitted accepting the goods prior to transferring them to the customer who subsequently inspected and rejected them. Because Prelude disputes acceptance, *GGO* is not helpful in determining whether it had a reasonable opportunity to inspect before transferring the crab to Winter and Rust.

middlemen. We conclude that this finding is not clearly erroneous and that, under the circumstances at hand, there is no reason to distinguish between a direct shipment and an "FOB seller's warehouse" delivery.[10] Giving weight to the determination of the trial court and the distances involved in this shipment, we conclude that Prelude did not waive the right to inspect by failing to do so in Madison and Philadelphia.

Even if Prelude's actions did constitute acceptance of the 500-box Winter lot, if Badger was given adequate notice, we would conclude that there was effective revocation of that acceptance under secs. 402.607(3)(a) and 402.608, Stats.[11] Badger suggests that because Pre-

---

[10] This distinction could be material regarding damage in transit. While that is an issue here as to a certain amount of breakage, we see no connection between the handling of the shipment and the alleged excess of unsaleable shoulders.

[11] Section 402.607(3)(a), Stats., provides:

> (3)  Where a tender has been accepted:
> (a)  The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy. . . .

> Section 402.608, Stats., provides in part:
> (1)  The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him *if he has accepted it:*
> (b)  *Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.*
> (2)  Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
> (3)  *A buyer who so revokes has the same rights and duties*

lude did not plead revocation, it should be barred from that remedy. We disagree. The issue is not whether Prelude pleaded revocation, but whether it pleaded facts which, if true, would constitute revocation. We must construe pleadings liberally with a view to doing substantial justice between the parties. *Strid v. Converse,* 111 Wis. 2d 418, 422, 331 N.W.2d 350, 353 (1983). Prelude's complaint can be read to plead facts which constitute revocation.

█

Because Prelude never had physical possession of the goods, we believe that any constructive acceptance it might have made was reasonably induced because of difficulties in discovering the nonconformity and because of Badger's assurances that the crab was "number one Bairdi." If Prelude properly notified Badger of the breach and revocation under secs. 402.607(3)(a) and 402.608(2), Stats., that revocation would have been effective.

### SUFFICIENCY OF NOTICE

Badger argues that, even if the goods were non-complying, Prelude did not give it adequate notice of the breach. Because Badger contends that Prelude accepted the goods, its arguments regarding notice concern sec. 402.607(3)(a), Stats. Notice of *rejection* is governed by sec. 402.602(1), which provides in part: "Rejection of goods must be within a reasonable time after their delivery or tender."

---

*with regard to the goods involved as if he had rejected them.* [Emphasis added.]

## (1) *Timeliness*

The criterion under either statute is that notice be given "within a reasonable time." Whether Prelude's notice was reasonably timely is also a determination so "intertwined" with the facts as to require us to "give weight to the trial court's decision. . . ." *Wassenaar,* 111 Wis. 2d at 525, 331 N.W.2d at 361.

The court concluded that Prelude gave Badger notice within a reasonable time. It found that Prelude notified Badger of the apparent breach by telephone in early May, 1982. It also found that, after unsuccessful attempts to settle the resulting dispute, Prelude cancelled the transaction involving the 500-box Winter lot "no later than June 1, 1982." The record supports these findings and we conclude they are not clearly erroneous.

Neither party cites authority establishing an appropriate standard of reasonableness. The record discloses no evidence of an express agreement regarding the time for rejection; nor is there evidence of an applicable usage of trade.

There is, however, uncontroverted evidence that the goods were kept in cold storage after delivery, and that frozen crab is only "semi-perishable." The record shows that Prelude discussed its customers' complaints with Badger during May, 1982. Finally, the record also shows that the ultimate cancellation of the transaction was deferred during the parties' unsuccessful negotiations. Given these facts and the determination of the court—which must be accorded some weight—we conclude that Prelude's notice to Badger was given "within a reasonable time" under either statute.

## (2) *Absence of Written Notice*

Badger also argues that, even if timely, Prelude's notice was insufficient because it was not in writing. Badger contends that, though oral notice of breach of warranty is effective between merchant and consumer, *Paulson v. Olson Implement Co., Inc.,* 107 Wis. 2d 510, 526, 319 N.W.3d 855, 862 (1982), it is not sufficient between merchants.[12]

There is no requirement of written notice in the statutes applicable to this case. Badger cites cases from a number of jurisdictions for the propositions that written notice is required between merchants and that there is insufficient evidence of notice in the absence of a writing. However, in Wisconsin, oral notice of breach of warranty is sufficient between merchants. *Kennedy-Ingalls Corp. v. Meissner,* 11 Wis. 2d 371, 105 N.W.2d 748 (1960).[13]

---

[12] Section 402.104(3), Stats., defines merchant as:

[A] person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction. . . .

Section 401.104(1), defines a transaction between merchants as:

[A]ny transaction with respect to which both parties are chargeable with the knowledge or skill of merchants.

[13] Badger claims *Kennedy-Ingalls* is inapposite, characterizing its subject transaction as one between a merchant and consumer. It has misread the facts. Kennedy-Ingalls was a supplier of work aprons it manufactured from defective smocks purchased from Meissner. The initial allegation of defect came from a Kennedy-Ingalls customer, the A.O. Smith Corporation, whose employee was burned while wearing such an apron. Kennedy-Ingalls orally notified Meissner of the unacceptable flammability of the fabric. The injured person was *not* a Kennedy-Ingalls employee, as Badger sug-

Though there is no written evidence of notice here, both witnesses testified as to telephone conversations between agents of the parties before cancellation of the transaction. Because oral notice of breach is sufficient in Wisconsin, the court—as finder of fact—was entitled to accord this testimony the weight it thought appropriate. *Thompson,* 115 Wis. 2d at 318, 340 N.W.2d at 718. On the basis of this evidence, it found that Prelude had adequately notified Badger of the breach in May, 1982. This finding is supported by the record and is not clearly erroneous.

*By the Court.*—Judgment affirmed.

gests. A.O. Smith, not Kennedy-Ingalls, was the consumer of the goods. Both parties in the case were merchants as to the transaction in question.