## CIRCUIT COURT OF FAIRFAX COUNTY

Micro Products, Inc.

v.

Sylvan Learning Systems, Inc.,
and Caliber Learning Network, Inc.

March 16, 1999

Case No. (Law) 166095

BY JUDGE DENNIS J. SMITH

This case was instituted by Micro Products, Inc. (hereafter "Micro") filing a Motion for Judgment alleging that Caliber Learning Network, Inc., and Sylvan Learning Centers, Inc. (hereafter "Caliber") failed to make full payment for videoconferencing products provided pursuant to an open account. Caliber answered by denying the claim and filing a counterclaim asserting that Micro breached the contract by supplying nonconforming goods and also breached a warranty of fitness for a particular purpose. Evidence was presented and briefs filed by both parties.

The evidence established that Caliber wanted a system which would permit training simultaneously at multiple sites using satellite broadcasting and videoconferencing technology. After some investigation, they determined that they would use an Intel based system called "Proshare Teamstations." Intel does not sell these directly but uses what are known as "value added resellers" (VARs) as intermediaries, and Micro is a VAR for Intel. Jim Hallihan was at all time relevant to this suit Micro's Vice President in charge of business development, and he was notified by Intel of Caliber's interest in the project. Discussions took place between Jim Hallihan and various employees of Caliber, including Sonny Taragin, Senior Director of Technology for Caliber. These discussions included a description of the business needs of Caliber, which included the capability of interactive communication between sites and the ability to control from a remote location

both the switching between satellite and videoconferencing and the focus of cameras at each location. Remote control of the system was crucial to Caliber as it would allow the system to function with fewer technically trained people involved in each session. The technical specifications were not supplied to Micro by Caliber but were developed by Micro who was given the needs and was to put together the technology to suit that need. Caliber did not accept all of Micro's recommendations for the components of the system but rather altered them somewhat for cost considerations. The systems were purchased, and the installation was done in part by Jim Hallihan and at more locations by UNISYS.

The team station system sold to Caliber by Micro had a myriad of problems in functioning as envisioned by the parties. Among other complaints, the successful connection rate between sites using the Micro Products system was less than fifty percent. This problem was of great concern to Caliber as once it established a date and time for a session, it needed to be able to rely on the system connecting and functioning in a timely manner. Additionally, the system froze when in use, which required rebooting of the system and recalibration of the settings. There were audio problems throughout the testing phase, and the development of software to enable remote control of cameras was also a failure.

Micro contends that the problems in the system were, in part, due to the change to television monitors as opposed to high resolution monitors recommended by Micro. The decision by Caliber to make this switch was made prior to the sale of the system to Caliber, and the decision was communicated to Jim Hallihan, who admitted being told this fact before he gave Caliber the final quote for purchase. Micro clearly knew it was selling a system with television monitors at the time of the sale, indicating that it believed at that time that the system would function without the high resolution monitors. Micro also argues that the problems lay in the installation of the systems by an independent contractor or in the operation of the systems by Caliber's employees.

The facts do not support these contentions. Jim Hallihan did not testify to any specific errors he observed in either installation or operation, despite the fact that he was aware of the complaints and attended some tests, including some where connectivity was a problem. Ample credible testimony was presented that no one from Micro lodged complaints about the installation, either before or after the systems were sold, or before or after they were installed, until a letter was sent from Micro President Richard M. Lee to Caliber President Chris Nguyen regarding the problems with the system and nonpayment of invoices by Caliber. Significantly, that letter does not indicate

any specific installation problems and notes that UNISYS personnel were trained by Intel on installation of the systems. In fact, even during the time the parties were trying to determine the cause(s) of the problems, Micro never sent anyone to a remote location to check on whether the system was properly installed. Jim Hallihan also admitted that he was responsible to ensure that the system as a whole functioned, bolstering the claim of Caliber that what was sold to them by Micro was a system, not component parts. Micro may have been in a difficult position as an intermediary between the producer and the user, but as a "Value Added Reseller," it assumed that role and made representations to the user regarding the systems capabilities.

Micro then contends that the hardware was "chosen by Caliber before Micro Products became the supplier, therefore there could be no reliance on Micro in the purchase." This argument is also rejected. Caliber may have decided on the team station product line, but the components in that system were ultimately selected or approved by Micro. In fact, Micro places great weight on Caliber's decision to reject the suggestion of Micro to use high resolution monitors, but as indicated above, Micro knew of this decision *before* making the last quote and never informed Caliber that the team station would not function properly without the recommended monitors or that it would not warranty the system if television monitors were used.

As for the software needed to enable remote control of cameras, it is undisputed that it had to be developed as no such software existed. Micro outsourced this project to Datalabs, a group based in Washington state, but the cost of the development was bundled into Micro's price for the system. See Defendant's exhibit 4. Mr. Hallihan testified that Micro, through Datalabs, designed a workable program but that the requirements of the system were constantly changing, making it ineffective. Micro also contended that remote camera controls were only to be provided upon the purchase of a certain number of Teamstations. This was denied by Caliber, and nothing in the documentation supports such a contract term. The more persuasive evidence, which included the testimony of Caliber's expert witness, William Wheaton, established that Micro was never able to produce an effective software program and that changes in the system after April 1997 were a result of the failure of the team stations to perform in the manner necessary to meet the needs of Caliber.

Accordingly, the Court finds that Caliber relied upon the expertise of Micro, the VAR for Intel, in the purchase of the Teamstations as configured at sale for use by Caliber in its videoconferencing training business; therefore, Micro extended a warranty of fitness for a particular purpose. Furthermore, the Court finds that Micro delivered nonconforming goods in breach of its

contract. It delivered goods which did not conform to the invoices, e.g., processor speeds below the speed set forth in the invoices, and also delivered a system which did not function as represented.

With regard to the software, however, it was acknowledged by all parties that specialized software would have to be developed to accomplish the controls desired by Caliber, and there is insufficient evidence to establish that any guarantees were given that the effort would be successful. This was not an existing technology demonstrated to Caliber by either Intel or by Micro in an effort to make a sale, but rather a joint endeavor to create new programming, and Micro did not breach its contract or any warranties by the failure of the effort.

Micro also asserts that the revocation of the acceptance by Caliber was not proper or timely; first, Micro contends that the revocation was not made in a commercially reasonable time as required by § 8.2-608 of the Virginia Code. What is "reasonable" "depends upon the nature, purpose, and circumstances of such action." § 8.1-204 of the Virginia Code. In this case, any defect in the computer system which was not curable was beyond the ability of Caliber to discover by mere inspection. As stated previously, the nature of the systems required proper installation and subsequent testing to determine whether the systems were functioning efficiently. When Caliber realized that Micro would not exert any further efforts to make the systems work, notice of revocation was given by letter of December 9, 1997, from Chris Nguyen, president of Caliber, to Richard M. Lee, President of Micro. There is no question that this letter constituted revocation of acceptance. Micro argues that it comes too late as it was seven months after the purchase order and nearly five months after delivery. In actuality, the delivery of the systems occurred in July 1997, but the testing of the system occurred over the next few months. In fact, Jim Hallihan testified that additional hardware was needed for the system as late as August 1997, less than three months before the revocation. Most importantly, Micro and Caliber were working on problems in the systems throughout this time frame and awaiting the upgrade RIO systems which were discussed in the original negotiations.

Furthermore, the Court finds that Caliber revoked its acceptance within a reasonable time after discovery of the nonconformity. When Caliber determined that the system was not working properly, it reasonably assumed that the defect in the goods would be cured. When Caliber realized that Micro would not comply with the specifications agreed upon, notice of revocation was promptly dispatched. If there was any delay in giving notice, it was specifically because Caliber gave Micro numerous opportunities to correct the defects in the system. In *Gasque v. Mooers Motor Car Co.*, 227 Va. 154

(1984), the Supreme Court held that where the delay in notification is brought about because the buyer gave the seller repeated opportunities to correct the defects, the delay is not unreasonable. Caliber's delay was reasonable in light of Micro's continuous attempts to effect repairs, which were only partially successful. After Micro made it clear that it would not deliver the upgraded system or make any further efforts to make the system work, Caliber promptly sent the December revocation of acceptance letter to Micro. Additionally, the Court notes that Caliber could still properly revoke in December of 1997, as there was no substantial impairment of the value of the goods because Caliber did not use the goods to a material degree prior to revocation, except in efforts to get the system to function properly. Overall, there was no substantial change in the condition of the goods due to Caliber's actions prior to revocation in December of 1997.

Micro claims that since Caliber did not plead revocation of acceptance in its Grounds of Defense, it is not properly before this Court as a defense to Micro's suit. *BellSouth Telesensor v. Informations Systems & Networks Corp.* 65 F.3d 166 (4th Cir. 1995), is instructive on the viability of this argument. In that case, BellSouth, the seller, made fruitless attempts to repair the equipment sold to ISN. ISN then sent a letter to BellSouth notifying of its intent to ship all equipment purchased back to BellSouth because of the failure of the goods to conform to the specifications provided. The Court found that this letter merely reiterated what BellSouth already knew, that the defendants contended that the goods were nonconforming because of BellSouth's repeated attempts to repair the goods to bring them into compliance. Additionally, in its Answer, ISN alleged that BellSouth was aware of the nonconformities that supported ISN's revocation of acceptance. Thus the Court founds that ISN complied with the "spirit, if not the letter, of § 8.2-608 procedural requirements" of notice of revocation and that ISN's failure to plead revocation of acceptance in its answer did not waive this defense. As stated in *Badger Produce Co. v. Prelude Foods Int'l*, 387 N.W.2d 98, 104-05 (Wis. Ct. App. 1986), "[t]he issue is not whether [the buyer] pleaded revocation but whether it pleaded facts which, if true, would constitute revocation."

In the case at hand, evidence presented during trial established that Micro was on notice of the computer system's nonconformity through its own repeated efforts to correct the deficiencies. Additionally, the letter of October 1, 1997, from Micro to Caliber clearly acknowledges Caliber's dissatisfaction with the performance of the system. Furthermore, the December 9, 1997, letter from Caliber to Micro expressly stated that Caliber intended to return the merchandise and wanted a return of monies paid to Micro. In its Grounds of Defense and Counterclaim, Caliber alleged that Micro failed to (1) provide

goods which were properly customized and configured for use by Caliber; (2) provide goods which were free from defects and conformed to certain agreed standards and specification; (3) provide goods which produced a videoconferencing system suitable for use by Caliber in centers throughout the United States; (4) provide goods which conformed to the affirmations, promises, and descriptions rendered by Micro Products' employees and/or agents; (5) provide goods which were fit for the particular purpose which Micro Products knew its goods would be used by Caliber; and (6) provide goods which were merchantable. Caliber also alleged that despite due and proper demand, Micro has not refunded to Caliber the purchase price paid by Caliber for the goods furnished by Micro. These allegations taken as a whole constitute sufficient notice to Micro that Caliber is proceeding on a theory of revocation of acceptance; therefore, Caliber's failure to specifically plead revocation of acceptance should not bar it from recovering damages under that theory.

The right to recover damages under a breach of warranty in regard to accepted goods is governed by § 8.2-714(2) of the Virginia Code. While the Court finds that Micro breached the warranty of fitness for a particular purpose, Caliber failed to present sufficient evidence by which the Court could reasonably calculate damages under § 8.2-714(2), which requires proof of the value of the goods as accepted and the value they would have had if they had been as warranted. Thus, the Court is limited to determining damages for Micro's breach for providing nonconforming goods as such may be calculated under Virginia Code § 8.2-711, which permits the aggrieved buyer who justifiably revokes acceptance to cancel the contract and recover so much of the purchase price as has been paid, and the "cover," or the cost of procurement of substitute goods, as defined in § 8.2-712(1). Caliber effected "cover" by purchasing a Picturetel system to serve its needs. The evidence was not sufficient for the Court to find that the Picturetel system was a reasonable substitute system for the Intel Teamstations. The Picturetel systems purchased had at least some components which were not in Teamstation systems purchased from Micro. In fact, Mr. Wheaton intimated that the absence of some of these components led to the inability of the Teamstation systems to perform as required. It would be inappropriate to hold Micro liable for the cost of a replacement system which is in essence an upgrade. Accordingly, Caliber is not entitled to recover damages for cover. However, as the Court finds that Caliber did timely revoke its acceptance of the defective goods, it is therefore entitled to a refund of the money paid to Micro for the goods purchased. Caliber paid Micro $384,456.04, but $40,605.00 was paid for equipment which was not part of the Teamstation purchase; therefore, judgment is

granted to Caliber against Micro in the amount of $343,851.04, with interest at the judgment rate from December 22, 1997.

For the reasons discussed above, Caliber is entitled to a refund of the sums expended to purchase the computer system from Micro.