James and Shirley RABY, individually, and as Special Administrator of the Estate of Steven Raby, Deceased, Plaintiffs-Respondents-Cross Appellants,

v.

Terrence Lee MOE, Defendant-Cross Respondent,

Victor GREEN, Defendant.

HERITAGE MUTUAL INS. CO., Defendant-Appellant-Cross Respondent.†

Court of Appeals.

*No. 88–0491. Submitted on briefs January 6, 1989.—Decided February 23, 1989.*

(Also reported in 441 N.W.2d 263.)

† Petition to review granted.

For the defendant-appellant-cross respondent the cause was submitted on the briefs of *Barrett J. Corneille* and *Bell, Metzner & Gierhart, S.C.,* of Madison.

For the plaintiffs-respondents-cross appellants the cause was submitted on the brief of *Richard E. Rosenberg* and *Nowlan & Mouat,* of Janesville.

For the defendant-cross respondent the cause was submitted on the brief of *Margaret B. Grabowski* and *Brennan, Steil, Basting & MacDougall, S.C.,* of Janesville.

Before Gartzke, P.J., Eich and Sundby, JJ.

EICH, J.    Heritage Mutual Insurance Company appeals from a judgment awarding civil damages to James and Shirley Raby, whose son Steven, a liquor store clerk, was killed during a robbery at the store. The robbery was planned and executed by four men, including Terrence Moe, whose parents were insured under a homeowners policy issued by Heritage. The Rabys sued Heritage, Moe and the three other men, claiming that Steven's death was caused by the men's negligence in planning and executing the robbery. Heritage claimed that its policy did not cover Moe's actions because of an

exclusion denying coverage for any acts "expected or intended" by the insured.

The jury found that Moe was negligent in conspiring with the others to commit the robbery, but that he had not "expected or intended" any injury to Raby. The jury apportioned the negligence forty-five percent to Moe and five percent and fifty percent, respectively, to two other conspirators (the fourth conspirator—the man who entered the store and shot Raby, was dismissed from the action after a default judgment was entered against him). Because the defendant who the jury found to be fifty percent negligent was insolvent, the trial court "redistributed" that negligence to Moe and the remaining conspirator, thus increasing Moe's allocation from forty-five to ninety percent and the other defendant's from five to ten percent, and entered judgment accordingly. The Rabys cross-appeal from that portion of the judgment reallocating the negligence among the defendants.

The issues on the appeal are: (1) whether the "intentional acts" exclusion in Heritage's policy bars coverage for Steven Raby's death; (2) whether the trial court erred when it declined to submit a question to the jury inquiring whether Raby's death was an "occurrence" within the meaning of the basic coverage sections of Heritage's policy;[1] (3) whether the "doctrine of fortuity" precludes Moe from from receiving "benefits"—in the form of insurance coverage—for his "criminal wrongdoing"; (4) whether the court erred in instructing the jury on various points; (5) whether the jurors were improperly informed of the ultimate effect of their verdict; and (6) whether the court erred in the

---

[1]While normally questions of basic coverage are considered prior to exclusions, we have reversed the order for ease of exposition.

admission and rejection of certain evidence. The sole issue on the cross-appeal is whether the trial court erred when it reallocated the negligence of the insolvent defendant. We resolve all issues in favor of the judgment and affirm.

The basic facts are not in dispute. Terrence Moe, Jeff Thompson, Victor Green and Charles Garnett planned the liquor store robbery. Green furnished a shotgun, shells, and other paraphernalia, and Moe drove the car. While Moe waited in the car, Thompson entered the store, took money from the cash register and shot and killed Raby. Thompson was tried and convicted of first-degree murder, while Moe, Green and Garnett (whose involvement was limited to helping plan the robbery) entered pleas to second-degree murder, party to the crime.

Raby's parents sued all four men for damages resulting from their son's death. Green, like Thompson, allowed a default judgment to be taken against him, and Garnett and his insurer settled with the Rabys prior to trial. As a result, the case went to trial primarily on the Rabys' claim against Moe and Heritage, although the verdict also asked the jury to ascertain and apportion the negligence of Moe, Green and Garnett. The jury found all three men causally negligent with respect to Steven Raby's death. As indicated, the jury also found that Moe neither expected nor intended that Raby would be injured during the robbery. Other facts will be referred to below.

## I. THE "INTENTIONAL ACTS" EXCLUSION

Heritage's policy excludes coverage for bodily injury "which is expected or intended by the insured," and it is conceded that Terrence Moe was an "insured" for

purposes of this action. Heritage argues first that the exclusion applies because the Rabys' lawsuit was originally one for the "intentional infliction of emotional distress," an intentional act within the meaning of the policy language.

In support of its argument, Heritage refers us to an allegation in the Rabys' original complaint to the effect that Thompson's act of pointing the gun at Steven Raby prior to shooting him caused Raby emotional distress before the trigger was pulled. But the fact remains that the Rabys never advanced a claim for intentional infliction of emotional distress at trial. Indeed, to the extent such a claim may have been alleged in the original pleadings, it was expressly withdrawn at trial, and the court, indicating that it was "dismissing" any such claim, never submitted it to the jury.

Heritage contends, however, that the issue was in fact tried, and that there is evidence in the record which would support a finding that Moe intended to cause harm to Raby—evidence that Moe believed that Thompson might use the shotgun to "scare" Raby into surrendering the cash register receipts. In particular, Heritage points to testimony of Moe and Thompson to the effect that they knew the clerk would be "scared" by the presence of the shotgun, and Moe's acknowledgment that he "didn't like the idea" of Thompson's use of a loaded gun because if the clerk also had a weapon there could have been a "shootout" in the store and thus a "good possibility" that someone could be injured. Moe also stated that he thought Thompson might use the gun to "just scare the clerk by shooting up in the air or something, or at his leg or something . . . ."

What Heritage's argument boils down to is that, in light of this testimony, Moe must be considered to have intended or expected some injury to Raby and that this is sufficient to invoke the exclusion, citing a statement in *Pachucki v. Republic Insurance Co.,* 89 Wis. 2d 703, 714, 278 N.W.2d 898, 904 (1979), quoting *Butler v. Behaeghe,* 548 P.2d 934, 938 (Colo. Ct. App. 1976), to the effect that the "intentional injury" exclusion applies if the insured "'acts with the intent or expectation that bodily injury will result even though the ... injury that does result is different either in character or magnitude from the injury that was intended.'" However, given the jury's finding that Moe did not intend or expect that Raby would be injured in the robbery, we fail to see how the quoted language aids Heritage's cause.

The question is not whether there is evidence in the record that might support Heritage's assertions. The intent to inflict injury which triggers the policy exclusion is a question of fact. *Pachucki,* 89 Wis. 2d at 711, 278 N.W.2d at 902. In this case, the jury specifically found that Moe, although a coconspirator in the robbery, neither intended nor expected that any injury would befall Raby that night. The law applicable to review of jury verdicts requires us to sustain the jury's findings if there is any credible evidence to support them. *Gegan v. Backwinkel,* 141 Wis. 2d 893, 899, 417 N.W.2d 44, 47 (Ct. App. 1987). "Our search is for evidence to sustain the verdict returned by the jury, not for evidence to sustain a result it could have reached but did not." *Id.* This is particularly true where, as here, the jury's findings have the approval of the trial court. *Fehring v. Republic Ins. Co.,* 118 Wis. 2d 299, 305, 347 N.W.2d 595, 598 (1984).

Moe testified that, while he thought Thompson might use the gun to attempt to scare the store clerk, it was not "any part of the plan for the armed robbery that anybody should shoot [him]." According to Moe, when he and the others planned the robbery, no one expressed any intention to shoot the clerk, and he stated unequivocally that he neither intended nor expected that any shooting would occur, or that the clerk would suffer any harm. Remembering that the Rabys' claim in this case was for their son's death, not for any fright he might have experienced before being shot, we are satisfied that Moe's testimony, together with the voluminous evidence on all aspects of the group's planning and execution of the robbery, provides adequate support for the jury's verdict. Given that verdict, the trial court correctly ruled that the policy exclusion did not apply.[2]

[2]Heritage also argues that, because they were coconspirators in the robbery, Thompson's "intent" to shoot Raby is imputed to Moe and, as a result, the "intentional acts" exclusion should apply. We agree with the trial court, however, that while sec. 939.05, Stats., imputes criminal responsibility for a particular offense to coconspirators, it does not impute intent. Indeed, the supreme court has recognized that one of the elements of a conspiracy under the statute is that "[e]ach member of the conspiracy must individually consciously intend the realization of the particular criminal objective." *State v. Nutley*, 24 Wis. 2d 527, 556, 129 N.W.2d 155, 167 (1964), *cert. denied*, 380 U.S. 918 (1965).

We see nothing in Heritage's reference to, and interpretation of, the questions asked the jury in another case, *Northwestern Nat. Ins. Co. v. Nemetz*, 135 Wis. 2d 245, 252–53 n. 1, 400 N.W.2d 33, 36 (Ct. App. 1986), that would cause us to hold otherwise. The issue of "imputation" of intent, as Heritage attempts to frame it here, simply was not present in *Northwestern*. As we have said, the jury in this case found that Moe did not intend or expect any harm to result

## II.  COVERAGE FOR "OCCURRENCES"

The primary "coverage" portions of Heritage's policy state that the company will pay for injuries "caused by an occurrence ...." In the context of such clauses, an "occurrence" is an "accident." *Smith v. State Farm Fire & Cas. Co.,* 127 Wis. 2d 298, 302, 380 N.W.2d 372, 374 (Ct. App. 1985).

Heritage argues that because there must be an "occurrence" in order for coverage to be extended in the first place—before one even gets to the question of whether "intentional injury" or any other exclusion might apply—the jury should have been asked to determine whether Raby's gunshot injuries "were caused by an accident."

We note first that the event—the "injury"—giving rise to this lawsuit was the shooting of Steven Raby. And whatever uncommunicated intent or design Thompson, once inside the store, may have formed to fire the shot, the question is not Thompson's intent,

---

to Raby from the robbery he and the others conspired to commit. And Heritage has offered no authority indicating that, because of this conspiracy, Thompson's "intent" to shoot and kill Raby during the robbery—however and whenever that "intent" was formed—should be "imputed" to Moe so as to invoke the terms of the "intentional acts" policy exclusion.

Finally this is not a case, like *K.A.G. v. Stanford,* 148 Wis. 2d 158, 434 N.W.2d 790 (Ct. App. 1988), where it can be said as a matter of law that Moe's intentional conduct (participating in the robbery) was "so certain to result in injury ... that the law will infer an intent to injure on behalf of the actor without regard to his or her claimed intent." *Id.* at 165, 434 N.W.2d at 793 (footnote omitted). In *K.A.G.,* the court so found with respect to the defendant's sexual assault on the plaintiff, a six-year-old girl. In this case, the question was properly submitted to the jury and, because there is evidence supporting the verdict, it is conclusive on the issue.

but Moe's. Thompson's intent is irrelevant to this action.

Second, the term "accident," as used in policies of insurance is to be given its "plain and ordinary meaning." *Welter v. Singer,* 126 Wis. 2d 242, 249, 376 N.W.2d 84, 86 (Ct. App. 1985). An "accident" is an "unplanned" event—one occurring by "chance" or "lack of intention." Webster's Third New International Dictionary 11 (1976). As we have said, the jury in this case expressly found that Moe neither expected nor intended injury to Raby. It also found that Raby's injuries were caused not by any intentional act on Moe's part, but by his negligence. Those findings, the first supported by competent evidence in the record and the second uncontested, are conclusive on this issue. And they are the equivalent of a finding that, as far as Moe was concerned, Steven Raby's death was an "accident." Additional questions and instructions on the subject would add nothing to the case. We agree with the trial court that the verdict questions and jury instructions on Moe's negligence and his intent or expectation of injury to Raby "cover[ed] the occurrence/accident language of the policy." We see no error.

## III. THE "DOCTRINE OF FORTUITY"

This rule, discussed in *Hedtcke v. Sentry Ins. Co.,* 109 Wis. 2d 461, 483–84, 326 N.W.2d 727, 738 (1982), denies insurance coverage for losses that are not "fortuitous," that is, in cases where "the damage is intentionally caused by the insured." The principle is based on various public policy considerations, notably

383

the desire to prohibit people from "profit[ing] from [their] wrongdoing." *Id.* at 484, 326 N.W.2d at 738.

Specifically, Heritage points to language in *Northwestern Nat. Ins. Co. v. Nemetz,* 135 Wis. 2d 245, 258, 400 N.W.2d 33, 38 (Ct. App. 1986), stating that "public policy considerations should prevent recovery by an insured who is not innocent with respect to intentional damages." We agree with Heritage that Moe was not an innocent party as far as the robbery was concerned. We can only note again, however, that the jury found that he *was* an innocent party with respect to Raby's shooting in that he neither intended nor expected that result. As a result, it was a "fortuitous" loss within the meaning of *Hedtcke* and *Northwestern,* and the rule does not bar coverage in this case.

## IV. CLAIMED ERRORS IN THE VERDICT AND INSTRUCTIONS

Heritage contends that the trial court erred in several respects in framing the special verdict and instructing the jury. Trial courts have wide discretion in deciding what instructions will be given, so long as they "fully and fairly inform[ ] the jury of the rules and principles of law applicable to the particular case." *D.L. v. Huebner,* 110 Wis. 2d 581, 624, 329 N.W.2d 890, 909 (1983). Even where there is instructional error, we will not reverse unless, considering the instructions as a whole, there is a probability—not just a possibility— that the jury was misled thereby. *Id.* at 628, 329 N.W.2d at 911.

Heritage argues first that the trial court improperly rejected its request that the jury be given the following instruction:

> *You are advised that an act may be so certain to cause a particular harm, that it can be said that a person who performed such act intended the harm. In other words, one's intent extends not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what he [or she] does. ... The practical application of this principle means that where a reasonable [person] in the defendant's position would believe that a particular result was substantially certain to follow, he [or she] will be dealt with as if he [or she] intended it.*
>
> A personal injury is substantially certain to follow even if the bodily injury that does result is different, in character or magnitude from the injury that was intended. It is not necessary that the defendant have a hostile intent or a desire to do any harm. Rather, it is an intent to bring about a result which will invade the interests of another in a way that the law will not sanction. [Emphasis added.]

The trial court gave only the first paragraph of the requested instruction in the following context:

> In order for you to answer "yes" to Question 3 [inquiring whether "injury to ... Raby [was] expected or intended by ... Moe"] you must be satisfied by a preponderance of the evidence that the shooting of ... Raby was expected or intended by Terrence Moe with a substantial certainty.
>
> *You are advised that an act may be so certain as to cause a particular harm that it can be said that a person who performs such act intended the harm. In other words, one's intent extends not only to those*

385

*consequences which are desired, but also to those which the actor believes are substantially certain to follow from what he [or she] does.*

The [person] who fires a bullet into a dense crowd may fervently pray that he [or she] will hit no one, but since he [or she] must believe and know that he [or she] cannot avoid doing so, he [or she] intends it. *The practical application of this principle means that where a reasonable [person] in the defendant's position would believe that a particular result was substantially certain to follow, he [or she] will be dealt with as if he [or she] intended it.* [Emphasis added.]

The court went on to give the pattern instructions on negligence and cause.

■ The trial court's discretion in framing jury instructions includes not only matters of emphasis, but also choice of language, detail and brevity. *Webb v. Wisconsin Southern Gas Co.*, 27 Wis. 2d 343, 350–51, 134 N.W.2d 407, 412 (1965). Thus, "[i]f the ... court's instructions adequately cover the law, we will not find error in its refusal to give a certain instruction, even where the proposed instruction is not erroneous." *Northwestern*, 135 Wis. 2d at 263–64, 400 N.W.2d at 41. Heritage's claim is essentially that additional language should have been included in the instructions, and that additional verdict questions should have been submitted on the question of Moe's intent to injure Raby. But the company has not persuaded us that the questions and instructions used by the court are either erroneous *per se*, or that they fail to adequately inform the jury on the applicable law.

We see little difference in substance or effect between Heritage's request and the instruction actually given by the court. Indeed, the illustration of a person firing a gun into a crowd, which the court used instead of some of Heritage's requested language, is taken from *Pachucki, supra,* the same case from which Heritage drew the wording for its request. In essence, Heritage's position is that the jury could find from the evidence that "a reasonable person would have expected Steven Raby to have received an injury" or that "an injury to Steven Raby was substantially certain to follow from the armed robbery" and should have been so instructed. In our view, the instructions as given permitted the jury to make those very determinations, and Heritage has not suggested how it could have been prejudiced, or the jury misled, by the instruction given by the court.

Heritage also contends that the court imposed an impermissibly high burden of proof on the question of Moe's intent by its use of the phrase "substantial certainty" in the first paragraph of the instruction as quoted above. Our reading of that paragraph satisfies us to the contrary. The challenged phrase does not describe the burden of proof on the question; the burden is plainly stated as proof by a preponderance of the evidence. Rather, the phrase is used in connection with the language immediately following: "one's intent extends ... to those consequences ... which the actor believes are substantially certain to follow from what he [or she] does"—and that language was requested by Heritage. As before, Heritage has not explained how the jury could have been misled by the instructions, and we see little, if any, chance for such a result.

Heritage also claims that the court erred in allowing a question on Raby's conscious pain and suffering to go to the jury when there was no evidence that Raby "had any moment of consciousness" after he was shot by Thompson. Such a question was included in the verdict, but the jury answered it "no" and awarded no damages. As a result, we do not see how Heritage could have been prejudiced by submission of the question. While Heritage's argument suggests that the evidence was somehow "inflammatory," it does not really pursue the point, and we do not consider matters that are merely stated, and never really developed or argued, in a party's brief. *State v. Beno,* 99 Wis. 2d 77, 91, 298 N.W.2d 405, 413 (Ct. App. 1980).

## V. INFORMING THE JURY OF THE EFFECT OF ITS VERDICT

It is considered error to inform jurors of the effect of their answers on the "ultimate result of the verdict." *Northwestern,* 135 Wis. 2d at 263, 400 N.W.2d at 40–41. Here, the introduction to the instruction accompanying the question on Moe's "intent" stated as follows: "The policy of insurance issued by Heritage Mutual provides that it will pay damages for which Terrence Moe is legally liable. It, however, excludes situations where the bodily injury is expected or intended by the insured." Heritage claims that the quoted language impermissibly informed the jury of the ultimate effect of its verdict.

The trial court, in a pretrial ruling on the issue, stated that it considered the real question in the case to be one of contract—whether the terms of Heritage's policy covered Moe's actions—and that there was little

that could or should be done to keep that knowledge from the jury. The court overruled Heritage's objections to any mention of the coverage issue, stating:

> There are times when a case, for practical purposes, just can't be tried without the jury having some insight into what's going to happen if they answer a question in [a] certain way. That one party or the other is going to prevail. That doesn't necessarily mean that they know all of the aspects of what happens if the party prevails and to know it affects a recovery.

We see no error.

We believe it would be apparent to any jury in a case such as this that insurance coverage is an issue. Indeed, Heritage's counsel conceded as much during his argument to the court at the pretrial hearing: "I agree that the jury is entitled to know there is a coverage dispute. They will know it anyway." Counsel maintained, however, that the jury should be informed of nothing beyond the fact that the issue exists: "What I don't agree is [sic] we tell the jury what the importance of certain issues are [sic] in resolving that dispute."

Aside from some discussion of the question at the posttrial instruction conference, the only mention of insurance coverage to which the parties have referred us is an objection by Heritage's counsel to a reference to the insurance policy during the Rabys' attorney's opening statement. Because the opening statements were not reported, however, the record is silent as to what was said. And, while Heritage's counsel did object to Raby's requested instruction informing the jury that Heritage would pay damages for which Moe is legally liable, he also advocated a contrary result when he

himself asked the court to "tell the jury that if a personal injury was expected or intended [by Moe] there is no coverage ... I think that's something they have got to know."[3]

We will not reverse a trial court's discretionary ruling—such as a decision to overrule an objection to the admission of evidence, or to give or refrain from giving a particular instruction—if the record shows that discretion was in fact exercised and we can perceive a reasonable basis for the court's decision. *Prahl v. Brosamle,* 142 Wis. 2d 658, 667, 420 N.W.2d 372, 376 (Ct. App. 1987). We have described the trial court's reasoning leading up to its decision to allow the reference to the policy, and we consider it to be the type of "logical rationale founded upon proper legal standards" that is necessary to the exercise of discretion. *McCleary v. State,* 49 Wis. 2d 263, 277, 182 N.W.2d 512, 519 (1971).

As to the existence of a rational basis for the court's conclusion, we do not consider it unreasonable to allow the jury to know that one of the key elements of this lawsuit was insurance coverage. The jurors were aware that Heritage insured Moe's family and that the company was not only a party to the action, but was represented by separate counsel. During the jury selection proceedings, prospective jurors were informed, without objection, that the Rabys were "seeking damages from the insurance company of Mr. Moe ... based

[3]The trial court, in its decision on postverdict motions, ruled that Heritage waived any such objection when it requested the converse of the same instruction: "[I]f a personal injury was expected or intended there is no coverage." Heritage does not address the waiver ruling in its briefs to this court, and we believe the trial court's decision could be sustained on this ground as well.

on negligence or conspiracy to perform a criminal act ...." Indeed, Heritage's own attorney informed the panel that he was representing the company and that "[s]ome of the questions you answer in the verdict will have an impact on whether or not there is insurance involved in this case." During the *voir dire,* members of the jury panel were questioned about any possible bias or prejudice they might have against insurance companies. At the conclusion of the trial, the jurors were instructed by the court that, in answering the special verdict questions, they should "not concern [them]selves about whether [their] answers will be favorable to one party or the other nor with what the final result of this lawsuit may be," and also that they should not add or subtract from the damages "because of sympathy or resentment or because one of the parties from whom damages are sought is an insurance corporation."

The basis for the rule against allowing juries to know the effect of their verdicts is "to secure a direct answer free from any bias or prejudice in favor of or against either party." *McGowan v. Story,* 70 Wis. 2d 189, 197, 234 N.W.2d 325, 329 (1975), quoting *Ryan v. The Rockford Ins. Co.,* 77 Wis. 611, 615, 46 N.W. 885, 886 (1890). It is designed "to get the jury to answer each question according to the evidence, regardless of the effect or supposed effect of the answer upon the rights of the parties as to recovery." *McGowan,* 70 Wis. 2d at 198, 234 N.W.2d at 329, quoting *Anderson v. Seelow,* 224 Wis. 230, 234, 271 N.W. 844, 846 (1937). The fear is that allowing jurors to know the effect of their answers on the ultimate result of the verdict will "affect[ ] the substantial rights of the part[ies] ...." *Kobelinski v. Milwaukee & S. Transport Corp.,* 56 Wis. 2d 504, 520,

202 N.W.2d 415, 425 (1972). We note, too, that a particular instruction, statement or argument does not violate the rule "merely because an intelligent juror might be able to infer therefrom the effect upon the final result of his [or her] answers to the special verdict." *Id.* at 521, 202 N.W.2d at 425.

Under the circumstances of this case, it is reasonable to conclude that even if the instruction had not indicated to the jury that its answer to the question on Moe's intent related to his insurance coverage, or lack of it, such an inference would be inevitable from the evidence and unobjected-to statements and arguments of counsel alone. We also believe that the admonitions in the court's instructions regarding the need for the jury to consider its verdict without regard to the insurance company's presence in the case, or to the effect of the answers on the ultimate result, militated against any possible adverse effect on Heritage's "substantial rights." *Kobelinski,* 56 Wis. 2d at 520, 202 N.W.2d at 425.

## VI. EVIDENTIARY ISSUES

Admission or rejection of evidence is committed to the trial court's discretion, and the familiar "exercise/rational basis" rules apply. Heritage argues first that the court abused its discretion when it allowed into evidence a letter written by Moe to Raby's parents after the robbery in which he apologized for his participation in the crime and stated that he never realized that "something this drastic was going to happen." Heritage does not explain how the court abused its discretion in admitting the letter, or how it (Heritage) was prejudiced

by the ruling. It does not develop the argument, other than to state that the contents of the letter were "completely irrelevant" and "prejudicial." Again, we do not consider undeveloped issues on appeal. *Beno,* 99 Wis. 2d at 91, 298 N.W.2d at 413.

Heritage also complains of the trial court's refusal to admit a statement given to the police by an acquaintance of Moe's to the effect that Moe had told him after the robbery that Thompson had put on his mask and loaded the shotgun after the two had arrived at the liquor store. Heritage claims the statement was improperly rejected because it was admissible to impeach Moe's testimony that Thompson had loaded the gun before they went to the store. The point is so minor in the context of the evidence as a whole, however, that even if admissible, its exclusion could not possibly have prejudiced Heritage's case. Beyond that, it appears from the record that Heritage's counsel read the statement to the jury during his examination of Moe.

## VII. REALLOCATION OF DAMAGES (THE CROSS-APPEAL)

As we have said, the jury apportioned the causal negligence in the case as follows: forty-five percent to Moe, fifty percent to Green and five percent to Garnett. Prior to trial, Garnett and his insurer reached a settlement with the Rabys and consented to the entry of a default judgment. For purposes of the postverdict motions, all parties stipulated that Green, who was then serving a prison sentence for his part in the robbery, was insolvent. Based on that stipulation, the trial court reallocated Green's share of the negligence to Moe and Garnett on a pro rata basis, adjusting the

percentages as follows: Moe—ninety percent, and Garnett—ten percent. The net effect of the court's reallocation—which, as indicated, "increased" the apportionment of negligence to Garnett from five to ten percent—is that the Rabys will be required to "satisfy" or "absorb" an additional five percent of the total damages found by the jury. This is so because, under the terms of the release they gave to Garnett, they agreed to accept the settlement in full satisfaction of whatever percentage of negligence might be attributed to Garnett at trial. They contend that the court erred in making the reallocation.

The trial court based its ruling on *Larsen v. Wisconsin Power & Light Co.,* 120 Wis. 2d 508, 520–21, 355 N.W.2d 557, 564 (Ct. App. 1984), where we held that the negligence of "immune and nonparty defendants" should be redistributed to the remaining defendants, in order to avoid requiring one defendant to "bear a liability resulting from the causal negligence attributed ... to the immune and nonparty defendants." In so holding, we noted that such a modification "affects only contribution rights among the tortfeasors" and "does not alter the injured party's right to full recovery from a joint tortfeasor more negligent than the injured party." *Id.* at 521 n. 6, 355 N.W.2d at 564. In reallocating Garnett's negligence in this case, the trial court followed the formula used in *Larsen.*

Like the trial court, we see no difference between immune and insolvent tortfeasors insofar as the basis for redistribution of negligence is concerned. Both are uncollectible, and the remaining solvent defendants should not have to bear "'an unequal proportion of the common burden'" caused by that uncollectibility. *Larsen,* 120 Wis. 2d at 520–21, 355 N.W.2d at 564, quoting *Hartford Fire Ins. Co. v. Osborn Plumbing,* 66 Wis. 2d

394

454, 460, 225 N.W.2d 628, 631 (1975). The Rabys claim, however, that requiring them to "satisfy" an additional five percent of the total verdict is not warranted.

It is undisputed that the Rabys settled with Garnett pursuant to a *Pierringer* release[4]—one in which the plaintiff agrees to hold the settling defendant harmless from any claims for contribution. Such releases have been held, as a matter of law, to operate to impute to the settling plaintiff whatever liability in contribution the settling defendant may have to nonsettling defendants. *Fleming v. Threshermen's Mut. Ins. Co.*, 131 Wis. 2d 123, 131, 388 N.W.2d 908, 911 (1986). And, as we have noted, the Rabys settled with Garnett for his proportionate share of the total causal negligence. We agree with Moe that the Raby's election to settle with one party should not impose a higher burden on the remaining parties. Had they not settled, Moe would be liable for ninety percent of the verdict, and it would not be equitable to hold him liable for ninety-five percent simply because of the Raby/Garnett settlement.

The Rabys do not challenge the rule of *Larsen,* other than to refer to earlier cases indicating that a plaintiff has the right to recover the total amount of his or her judgment against any negligent defendant. Whatever the import of those cases, *Larsen* is the most recent statement on the reallocation of negligence, and we believe it states the applicable law. The Rabys suggest, however, that we should not follow *Larsen* because reallocation of the negligence of an immune or insolvent party introduces an element of uncertainty

[4]*Pierringer v. Hoger,* 21 Wis. 2d 182, 193, 124 N.W.2d 106, 112 (1963).

into settlement negotiations, and, further, that litigating parties' solvency in addition to liability and damages would unduly complicate personal injury trials.

As to the first, *Pierringer* settlements always involve uncertainties, for their value is contingent on the outcome of the case. If a plaintiff, prior to trial, settles with one defendant for $10,000, and the jury later apportions fifty percent of a $100,000 verdict to that defendant, it would be a poor bargain indeed. The reverse is often true as well. Here, for example, the Rabys settled their claim against Garnett prior to trial for $27,500, with no knowledge as to how much the jury might award in total damages or how much of the total negligence might be assigned to Garnett. As it turned out, had they not settled, the jury verdict would have given the Rabys only $5,700 for Garnett's share of the negligence. We do not see that permitting reallocation of an immune or insolvent defendant's share of the negligence would inject any further uncertainties into an already highly uncertain process.

Nor have the Rabys persuaded us that, should it become necessary in a given case, determining a party's solvency or insolvency would add undue complications to the trial process. Here, for example, Garnett's insolvency was apparent and the parties—including the Rabys—so stipulated. Under such circumstances, we do not see how they can be heard to complain or speculate on the difficulties of proof on the issue. Even so, we note that the solvency of parties is frequently explored during the course of litigation—whether for purposes of naming the party in the complaint in the first instance or investigating settlement possibilities.

396

The Rabys' "policy" reasons for not following *Larsen* and similar cases are unavailing.

*By the Court.*—Judgment affirmed.