Brian GEGAN, individually, Jennifer Gegan, individually, Allison Gegan, a minor by Brian Gegan, her general guardian, and Michael W. Wilcox, as successor personal representative of the Estate of Edward Gegan, Deceased, Plaintiffs-Respondents,

v.

Klaus D. BACKWINKEL, M.D., Jackson Clinic, Chartered, and Continental Assurance Company, d/b/a CNA Insurance, Defendants-Appellants,

PATIENTS COMPENSATION FUND, Defendant.

Court of Appeals

*No. 86–1476. Submitted on briefs September 14, 1987.— Decided October 15, 1987.*

(Also reported in 417 N.W.2d 44.)

For the defendants-appellants the cause was submitted on the briefs of *Briony Jean Foy* and *Allen A.*

*Arntsen* and *Jenswold, Studt, Hanson, Clark & Kaufmann,* of Madison.

For the plaintiffs-respondents the cause was submitted on the brief of *Peter W. Bunde, Donald K. Schott* and *Ralph V. Topinka,* and *Quarles & Brady,* of Madison.

Before Eich, Cane and Myse, JJ.

EICH, J. Dr. Klaus Backwinkel, the Jackson Clinic and CNA Insurance (collectively "the clinic") appeal from a judgment entered on the jury's verdict in this medical malpractice case. The issues are: (1) whether the fact that the clinic's postverdict motions were never heard by the trial court due to the judge's disability precludes entry of judgment on the verdict pursuant to sec. 805.16, Stats; (2) whether the jury's answers to the causation and damage questions are supported by credible evidence; and (3) whether the trial court abused its discretion when it allowed certain photographs and other material to be sent to the jury room during deliberations and refused to send in portions of the Patients Compensation Panel findings. We resolve all issues against the clinic and affirm.

The basic facts are not in dispute. Gegan began experiencing abdominal pain, diarrhea, and rectal bleeding in early January, 1976. Between January 5 and January 23 he was seen by clinic physicians on several occasions, but his condition remained undiagnosed. On January 23 he underwent exploratory surgery, which revealed a perforated bowel. The perforation was repaired and a colostomy performed. Gegan's condition worsened after the surgery and he died on April 12, after undergoing two additional operations. His family and survivors filed a claim with

the Patients Compensation Panel alleging that the negligence of various clinic doctors in failing to diagnose his condition caused his eventual death. The panel found the clinic free of any negligence and dismissed the claim. Gegan then sued in circuit court and, on April 4, 1986, the jury found the clinic causally negligent and awarded damages.

The clinic filed postverdict motions challenging the sufficiency of the evidence and seeking, alternatively, modification of the verdict or a new trial. Before the motions could be heard, the trial judge, the Hon. Richard W. Bardwell, was temporarily disabled in a bicycle accident and no action was ever taken on the motions. After more than ninety days had passed without a decision on the motion, another Dane County circuit court judge, the Hon. Michael Nowakowski, entered judgment on the jury's verdict pursuant to sec. 805.16, Stats. (1985–86), which provides that "[i]f an order granting or denying a motion challenging the sufficiency of evidence or for a new trial is not entered within 90 days after verdict, the motion shall be deemed denied."

## I.   DISABILITY OF THE TRIAL JUDGE

The clinic argues first that Judge Nowakowski's entry of judgment as a ministerial act violated sec. 751.03(4)(b), Stats., which provides:

> If a judge before whom an action or proceeding has been tried is unable to proceed after a verdict is returned or findings of fact and conclusions of law are filed, the judge to whom the case is assigned may proceed with it unless satisfied that the duties cannot be performed without prejudice

to the parties, in which event a new trial may be granted.

The clinic contends that the judgment cannot stand because it does not recite that Judge Nowakowski determined that he could "perform [the] duties without prejudicing the parties, or that he ever considered the merits of [d]efendants' motions after verdict."

We fail to see the applicability of the statute. It is but one part of a procedure under which the chief justice is empowered to assign active or reserve judges to serve in courts around the state "to aid in the proper disposition of business ...." Sec. 751.03(1), Stats. Where such an assignment is made in midtrial, the assigned judge may take over and continue the trial upon certifying that he or she is familiar with the record and will be able to complete the case without prejudicing either party. Sec. 751.03(4)(a). Where the chief justice assigns a replacement judge after verdict, sec. 751.03(4)(b) allows that judge to step in and handle further proceedings in the case if he or she is satisfied it can be done without prejudice to the parties.

In this case, no effort was made, or any action taken, to secure the appointment of a replacement for Judge Bardwell at any time after his disabling accident. After the ninety-day time limit in sec. 805.16, Stats. (1985–86), had expired, he simply signed the judgment as a ministerial act in his capacity as "duty" or "intake" judge for that week. Nowakowski had not been assigned by the chief justice to serve in Bardwell's court or to preside over further proceedings in the case. Indeed, there could be no further proceedings, for once ninety days had elapsed from the date of the verdict the trial court "lost [its] competency to

exercise ... jurisdiction" to decide the motions. *Jansen Co. v. Milwaukee Area Dist. Board,* 105 Wis. 2d 1, 10, 312 N.W.2d 813, 817 (1981). And it cannot achieve the same result through other means, such as ordering a new trial in the interests of justice. *Manly v. State Farm Fire & Cas. Co.,* 139 Wis. 2d 249, 255, 407 N.W.2d 306, 308 (Ct. App. 1987). Death or disability of the presiding judge during the statutory period does not change the rule.

Nor do we accept the clinic's contention that its rights were prejudiced because judgment was entered by Judge Nowakowski without considering the merits of the postverdict motions. The argument appears to be that a new trial is warranted in all instances where a judge dies or becomes disabled during the ninety-day period because only the judge who heard the evidence is competent to decide the motion. The only authorities cited in support of the argument are cases defining the powers of successor judges who attempt to overturn decisions or rulings of their predecessors. But this is not such a case; the judgment here was entered by operation of law, not by a successor judge attempting to second-guess a predecessor.

Section 805.16, Stats., is plain in its terms and in its effect. If no order granting the postverdict motion is entered within ninety days of the verdict, the motion is deemed denied. The statute does not say that the motion is deemed denied after ninety days *only if* the judge has first considered it on the merits. Indeed, the time limitation was created in 1917 "to prevent the delay in the administration of justice which had previously resulted by reason of some trial courts having heard arguments on motions after verdict for a new trial and then having deferred the rendering of their decisions thereon for long periods of

time." *Guptill v. Roemer,* 269 Wis. 12, 18, 68 N.W.2d 579, 582, *reh'g denied,* 69 N.W.2d 571 (1955). Whether the trial judge considers the merits of the motions or simply lets the time expire rather than drafting a denial is of no consequence under sec. 805.16. All that is required for denial of the motion and entry of judgment on the verdict is the passage of time without issuance of a decision. Once that occurs, the court has jurisdiction only to enter judgment on the verdict, and that is a ministerial act. The judgment is, of course, appealable.

## II. SUFFICIENCY OF THE EVIDENCE

We will sustain a jury verdict if there is any credible evidence to support it. *Meurer v. ITT General Controls,* 90 Wis. 2d 438, 450, 280 N.W.2d 156, 162 (1979). Our search is for evidence to sustain the verdict returned by the jury, not for evidence to sustain a result it could have reached but did not. *Id.* at 450–51, 280 N.W.2d at 162–63. We are also guided by the rule that the credibility of the witnesses and the weight accorded their testimony is left entirely to the jury. *Cogswell v. Robertshaw Controls Co.,* 87 Wis. 2d 243, 250, 274 N.W.2d 647, 650 (1979).

The clinic argues first that there was no credible evidence that any actions by its staff were a cause of Gegan's death—that none of respondents' expert witnesses so testified to a reasonable medical probability. Our review of the record satisfies us to the contrary.

One of respondents' witnesses, Dr. John Morrissey, was asked whether he had an opinion, to a

899

reasonable degree of medical certainty, that the clinic physicians, in the exercise of the applicable standard of care and skill, should have diagnosed Gegan's perforated colon prior to surgery. He responded: "My opinion is that they should have made the diagnosis." He also stated that, assuming such a diagnosis had been made, a colostomy would be "inappropriate" and "inadequate" treatment. Dr. Morrissey also testified that if Gegan's condition had been properly diagnosed and appropriately treated, his chances of survival would have been "better than ninety percent." Finally, when asked whether he had an opinion as to whether the clinic's failure to render proper care and treatment to Gegan prior to January 23 "was a substantial factor in causing his death," Morrissey responded that "the lack of care—well, the care given definitely contributed to his death."

Another of respondents' witnesses, Dr. John De Giovanni, gave his opinion that Gegan's treatment was "inadequate" in several respects, and that the January 23 surgery was both premature and inadequate for a perforated colon, had that condition been diagnosed. Finally, Dr. De Giovanni testified that the clinic's failure to treat Gegan in a manner consistent with the appropriate standard of care was "a substantial factor in his subsequent death."

The clinic points out that Morrissey also testified that Gegan was already very ill when he first came to the hospital and had "some possibility" of dying, and that De Giovanni stated at one point that he would have "proceeded at surgery in exactly the same fashion that Dr. Backwinkel proceeded" on January 23. In addition to these and other internal inconsistencies in the testimony of the two doctors testifying on

Gegan's behalf, the clinic also points to the contrary testimony of its own physician witnesses.

As we have said, however, our task is only to look for evidence to support the jury's verdict. It is for the jury, not the court, to resolve conflicts in the testimony of experts. *Brogan v. Industrial Cas. Ins. Co.*, 132 Wis. 2d 229, 239, 392 N.W.2d 439, 444 (Ct. App. 1986). The same is true for internal inconsistencies in the testimony of a single expert witness; if they exist, they "are to be reconciled and resolved by [the] jury." *Wirsing v. Krzeminski*, 61 Wis. 2d 513, 525, 213 N.W.2d 37, 43 (1973).

The clinic also argues that there was no credible evidence to support the jury's award of damages for pain and suffering and pecuniary loss. The jury awarded $175,000 for Gegan's pain and suffering, after being instructed, among other things: (1) that the figure selected should represent "reasonable compensation for such pain and suffering as you are reasonably certain he endured and suffered as a natural result of his treatment [by the clinic]"; and (2) that consideration of any damages from his "original illness"—his condition when he first began treatment at the clinic—must be "entirely exclude[d] from ... consideration" and compensation allowed only for those damages sustained as a result of his treatment at the clinic.

After his surgery on January 23, 1976—the colostomy and repair of the perforated bowel—Gegan's condition worsened. On February 18, he underwent a second operation in which his entire colon was removed. A third operation, on February 25, revealed additional perforations in the bowel, and Gegan continued to perforate until the time of his death on April 12. Death was caused by a pulmonary embolism

secondary to sepsis, peritonitis, repeated bowel perforations, and ulcerative colitis. From January 23 until his death, Gegan was hospitalized for a total of ninety-one days. The clinic's argument, in essence, is that the evidence provided no basis for the jury to separate the pain and suffering incident to his "original illness"— his condition when he first came to the clinic in early January—from that caused by the clinic's subsequent treatment. We disagree.

The jury found that the clinic was negligent in caring for and treating Gegan and that that negligence was a cause of his death. We have affirmed those findings as supported by credible evidence. The jury also determined that $175,000 would constitute fair and reasonable compensation for the pain and suffering he endured because of the clinic's negligent failure to diagnose and properly treat him. The medical records and nurses' notes compiled during Gegan's three-month hospitalization indicate that he underwent substantial pain and suffering during that time. There was also evidence of his mental pain as he was approaching death. In addition, Dr. Morrissey testified that had Gegan's illness been properly diagnosed and treated when he first came to the clinic, he would have had to undergo only one operation and a ten to fourteen day hospitalization. In fact, he underwent three operations and a lengthy hospitalization between early January and his death on April 12, 1976. There was credible evidence to support the award for pain and suffering.

The jury also awarded $250,000 for the pecuniary loss incurred by Gegan's children as a result of his death, and the clinic argues that this amount is excessive as a matter of law. Here, too, the clinic emphasizes that Gegan was ill when he first came to

the clinic, with only limited chances of survival. As we noted earlier, however, Dr. Morrissey testified that, properly treated, Gegan's chances of survival were ninety percent.

The only witness testifying on pecuniary loss was Gegan's expert, Professor William Holahan, who estimated the children's total loss at approximately $600,000. The components of the loss were stated to be: $298,776 for loss of financial support; $56,760 to $180,000 for loss of college funds; and $120,294, representing loss of inheritance. Holahan's testimony was admitted without objection, and the clinic offered no evidence in rebuttal.

On cross-examination, Holahan acknowledged that his figures should be discounted by $10,000 for an arithmetical error and the clinic asserts that the total sum should be further reduced by 27.5 percent for projected income tax liability. Even subtracting those amounts, Holahan's testimony would provide ample support for the jury's award of $250,000. The clinic argues, however, that the entire amount allocated for college expense should be deleted because Gegan's legal obligation to support his children would end when each reached the (pre-college) age of eighteen. We see no support in the record for the clinic's argument that Gegan would not have provided for his children's education, regardless of when they turned eighteen.

The clinic also suggests that the amount testified to by Holahan for lost support is greater than a figure calculated by application of the child support guidelines established by the Wisconsin Department of Health and Social Services for use in divorce and paternity cases. The guidelines were neither offered in

903

evidence nor judicially noticed at trial, however, and the jury cannot be faulted for failing to apply them when they were never brought forth. Moreover, their relevance to the issues in this case has not been determined, and the mere fact that they exist, and that the manner in which the clinic has applied them to Gegan's situation would result in a figure less than $250,000, cannot replace Holahan's uncontradicted testimony as a basis for the jury's award.

Finally, the clinic argues that the figure for loss of inheritance is based on a normal lifespan, which Gegan could not hope to achieve in light of his "original illness." Again, according to Dr. De Giovanni, Gegan would have had a normal life expectancy had he been properly treated.

The clinic's argument is, in essence, that its cross-examination of Holahan should convince us that his direct testimony is simply not to be believed. But witness credibility is for the jury. As we have said, our task is to search the record for evidence to support the jury's findings, viewing the evidence in the light most favorable to the verdict. The question is not whether we would have arrived at the same result or one entirely opposite; it is whether the jurors, acting reasonably in light of the evidence before them, could have reached the result they did. Even if we may not have done so were we in their place, we must defer to their assessment of the evidence.

## III.  ABUSE OF DISCRETION

The clinic contends that the trial court abused its discretion by allowing certain photographs and newspaper articles to go to the jury, and by refusing to send

in the written findings of the Patients Compensation Panel.

Two photographic exhibits were admitted into evidence without objection. One was a snapshot of Gegan, his wife, and a nurse in his hospital room, and the other was a page from a family photo album containing several pictures of the Gegan family. At the conclusion of the trial, the court heard counsel's objections to sending specific exhibits to the jury room. The only reference to a photograph by the clinic's attorney was the following statement: "I don't want that one photograph because one side of it was admitted." At a later point, he responded to the court's question about medical records as follows: "No, no. The picture on the chair—.... Including the pictures on the back of that." The remarks are not further explained in the record, and even if they could be considered objections, we have no way of knowing what "photographs" or what "picture" counsel may have been referring to. "Without a specific objection which brings into focus the nature of an alleged error, a party does not preserve its objections for review." *Zeller v. Northrup King Co.,* 125 Wis. 2d 31, 35, 370 N.W.2d 809, 812 (Ct. App. 1985).

As indicated, the Patients Compensation Panel dismissed the initial claim. The panel's findings were admitted in evidence as required by sec. 655.19, Stats. (1984–85), and they were read to the jury. The clinic argues, however, that the trial court erred by refusing to send the findings to the jury room during deliberations. Here, too, the clinic did not object to the ruling when the court and counsel were discussing which exhibits should go to the jury room. The subject first came up just prior to trial during a discussion of the

admissibility of the panel's decision. The trial court stated at that time: "I will let you get into evidence the ultimate findings, but I am not going to send this to the jury." The clinic's counsel made no objection. On this record, we see no error in the court's actions.

Finally, the clinic contends that the trial court erred by instructing the jury at the time the panel's findings were read into the record that counsel would be free to comment on them and that they should be weighed by the jury along with all other evidence in the case. In its closing instructions, the court again stated that the panel findings were not binding on the jury, but should be weighed and considered along with all the other evidence. There was no objection to either the contemporaneous or the final instructions and the clinic has thus waived the right to challenge them on appeal. *Hamed v. Milwaukee County,* 108 Wis. 2d 257, 271, 321 N.W.2d 199, 207 (1982).

*By the Court.*—Judgment affirmed.