STATE of Wisconsin, Plaintiff-Respondent,

v.

Sherideane P. PETERS, Defendant-Appellant.†

Court of Appeals

*No. 94–1094–CR. Submitted on briefs January 23, 1995.—Decided March 21, 1995.*

(Also reported in 534 N.W.2d 867.)

†Petition to review denied.

676

For the defendant-appellant the cause was submitted on the brief of *Daniel E. Ensley* of Menasha.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle*, attorney general, and *James M. Freimuth*, assistant attorney general.

Before Cane, P.J., LaRocque and Myse, JJ.

MYSE, J. Sherideane Peters appeals a judgment of conviction for six crimes, including: one count of kidnapping, contrary to § 940.31(1)(b), STATS.; two counts of first-degree sexual assault, contrary to § 940.225(1)(b), STATS.; one count of armed robbery, contrary to § 943.32(1)(b) and (2), STATS.; one count of attempted first-degree intentional homicide while using a dangerous weapon, contrary to §§ 940.01(1), 939.32(1)(a) and 939.63, STATS.; and one count of mayhem, contrary to § 940.21, STATS. Peters contends that his conviction should be reversed and the cause remanded because: (1) the evidence of the statistical probability that his DNA (deoxyribonucleic acid) matched the DNA of the perpetrator was unreliable; (2) the DNA evidence violated his right to equal protection under the Fourteenth Amendment to the United States Constitution; (3) the trial court erred by admitting other crimes evidence; and (4) the trial court erroneously exercised its discretion by imposing an unduly excessive sentence. We reject Peters' arguments and affirm the judgment.

## FACTS

On April 20, 1992, Peters abducted fifteen-year-old Sarah B. at gunpoint from a DePere parking lot, placed her in the trunk of a vehicle and drove to a Brown County Park. Once at the park, Peters led Sarah to a wooded area, where he forced her to participate in acts of fellatio and penis-vagina intercourse. Peters then

robbed Sarah of her jewelry, cut her eyelids with a knife and attempted to kill her by stabbing her repeatedly in the neck, chest and abdomen.

Peters was eventually apprehended and charged in a six-count information. Prior to trial, Peters filed a motion opposing the admission of DNA evidence. A hearing was subsequently held on the matter. At the hearing, Peters did not dispute that his DNA matched the DNA taken from Sarah's clothes and person.[1] However, as a Native-American, Peters argued that the DNA evidence was not sufficiently reliable because the probability statistics were based on comparisons to population databases that did not include Native-Americans. Accordingly, Peters argued that the evidence should not be admissible at trial because the population databases may not adequately account for variances among his ethnic heritage.[2]

The State conceded that there was no population database for Native-Americans. However, it argued that precautions were taken to increase the reliability of the probability calculation. Specifically, the State argued that the "ceiling method" of probability calculation, which was used by the private laboratory that conducted the DNA testing for the State, was sufficiently reliable to be admissible at trial. Under the ceiling method, each matching probe[3] of the defen-

---

[1] A DNA "match" means only that the defendant could be the source of the evidence in question. Once it is determined that the defendant's DNA matches the sample taken from the victim, a calculation must be performed to determine the probability that the match is merely a coincidence.

[2] The three population databases to which Peters' DNA was compared were: (1) Hispanic; (2) African-American; and (3) Caucasian.

[3] The matching process has been explained as follows:

682

dant's DNA is compared to the three population databases to determine the frequency with which the probes occur in each database. The laboratory then uses the highest frequency for each probe in performing the probability calculation, thereby making the calculation more favorable to the defendant.[4] Additionally, the laboratory uses a 95% upper confidence level of statistical variance, which is designed to provide further compensation for the lack of a Native-American database. At the conclusion of the hearing, the trial court determined that the laboratory's probability calculations regarding Peters' DNA were sufficiently

> To determine a match, scientists localize alleles, or variations of coding sequences that differ from person to person, which occur at specific sites on the DNA molecule. Using a process known as Restriction Fragment Length Polymorphism (RFLP), the DNA molecule is cut into fragments by restrictive enzymes that recognize certain coding sequences. Variations in coding sequences will cause the restrictive enzymes to cut the DNA into varying lengths. The DNA fragments are "unzipped" so that the strands and base pairs are separated from each other, and the fragments are arranged vertically according to length. A single-locus probe, which is a single strand of DNA coded to attach to a specific sequence of DNA, is mixed with the arranged fragments. The probe will attach to the fragments, regardless of their length, wherever it recognizes its matching sequence.

L. Damon Whitmore, Note, *The Admissibility of DNA Evidence in Criminal Proceedings*, 39 WAYNE L. REV. 1411, 1413-14 (1993).

[4] For instance, if one matching probe occurs in eighteen percent of the Hispanic population database, twenty percent of the African-American database and thirty percent of the Caucasian database, the laboratory will use the thirty percent frequency in its probability calculation because the higher frequency makes it more likely that the match between the defendant's DNA and that of the perpetrator occurred by chance. In sum, use of the higher frequency favors the defendant.

reliable and denied Peters' motion. The case then proceeded to trial.

At trial, the jury was presented with the results of the DNA testing. Doctor Lisa Forman, an expert in population genetics, testified that Peters' DNA was compared to the DNA taken from Sarah's cervical swabs, vaginal swabs and shorts. Based on this comparison, and using the ceiling method of probability calculation, Forman testified that the likelihood that Peters' DNA would match the DNA of the perpetrator by chance was one in 7.6 million. Additionally, Forman testified that she compared Peters' DNA to each of the three population databases using a basic probability calculation to determine the likelihood of a chance match. Based on these calculations, Forman testified that the likelihood of a chance match between Peters' DNA and that which was taken from Sarah's person and clothes was one in 340 million for the Caucasian population, one in 26 billion for the African-American population and one in 260 million for the Hispanic population.

In addition to the DNA testimony, the State offered the testimony of three young women who testified that they had encounters with Peters on the same day that Sarah was abducted. Beth L. and Kimberly M., ages sixteen and fifteen respectively, testified that they were at a Green Bay mall on April 20, 1992, when a man with long black hair, a black leather jacket, white shirt and jeans followed them from store to store. The girls contacted the police the following day, and each girl separately identified Peters in a photo line-up as the man who they saw in the mall.

Nancy Herwald, age eighteen, testified that she was walking on a sidewalk approximately two miles from the park where Sarah was attacked when she

noticed a car following her at a slow pace. She stated that the driver of the vehicle leaned out of the car and asked "[w]here are you going little girl?" She further stated that the driver drove off when a dog barked. Herwald testified that the man had long, dark, wavy hair, wore a white shirt and had a tattoo on his upper left arm. She identified Peters at trial as the man in the vehicle.

The jury ultimately found Peters guilty on all six counts of the information. The trial court determined that Peters was a repeat offender under § 939.62, STATS., and sentenced him to thirty-five years on the attempted homicide conviction and to consecutive thirty-year prison terms on the remaining five convictions. Peters appeals.

## ADMISSIBILITY OF SCIENTIFIC EVIDENCE

■■■■

The first issue is whether the trial court properly admitted the DNA evidence. We review a challenge to the admissibility of evidence deferentially under the erroneous exercise of discretion standard. *Badger Produce Co. v. Prelude Foods Int'l*, 130 Wis. 2d 230, 235, 387 N.W.2d 98, 101 (Ct. App. 1986). We will uphold the trial court's discretionary decision if it "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Appleton Post-Crescent v. Janssen*, 149 Wis. 2d 294, 302-03, 441 N.W.2d 255, 258 (Ct. App. 1989).

Peters contends that the statistical probability evidence, which was derived from the DNA tests, was unreliable because his DNA was compared to population databases that did not include Native-Americans.

685

Accordingly, Peters argues that the trial court erred by admitting this evidence. We are not persuaded.

Traditionally, state courts have used one of two approaches to determine whether scientific evidence is admissible: the *Frye* test or the relevancy test. The *Frye* test, which was first articulated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), conditions the admission of scientific evidence upon whether the underlying scientific principle has gained "general acceptance in the particular field to which it belongs." *Id.* at 1014. If the trial court determines that the scientific principle is generally accepted in the scientific community, the evidence is deemed to be sufficiently reliable to be admitted at trial. *United States v. Jakobetz*, 955 F.2d 786, 794 (2d Cir. 1992).

In *Daubert v. Merrell Dow Pharmaceuticals*, 113 S. Ct. 2786, 2794 (1993), however, the United States Supreme Court held that the *Frye* test was superseded by Fed. R. Evid. 702. Federal R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■

When faced with a question regarding the admissibility of scientific evidence under Rule 702, the trial court must determine whether the evidence will assist the trier of fact.[5] While *Daubert* represents a shift

---

[5] To aid the trial court in making the admissibility determination, the Supreme Court established a framework to ensure the reliability of the particular scientific principle. Under this framework, the Court noted that the trial court should consider

away from *Frye*'s general acceptance test, the court noted that the reliability of the particular scientific evidence was still a prerequisite to admissibility. *Daubert*, 113 S. Ct. at 2795. Specifically, the Court stated: "[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* If the trial court does not conclude that the scientific evidence is both relevant and reliable, the evidence may not be admitted. Thus, under *Frye* and *Daubert*, reliability is a necessary condition to the admission of scientific evidence.

In Wisconsin, however, our supreme court expressly rejected the *Frye* test in favor of the relevancy test. *Watson v. State*, 64 Wis. 2d 264, 273, 219 N.W.2d 398, 403 (1974). Because Wisconsin rejected the *Frye* test and adopted a test unrelated to that used by the federal courts and many state courts, our standard for the admission of scientific evidence was unaffected by *Daubert*. Thus, the rule remains in Wisconsin that the admissibility of scientific evidence is not conditioned upon its reliability. Rather, scientific evidence is admissible if: (1) it is relevant, § 904.01, STATS.;[6] (2) the witness is qualified as an expert,

---

several factors in determining whether scientific evidence is admissible, including: (1) whether the theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review; (3) "the known or potential rate of error"; and (4) whether the theory or technique is "generally accepted." *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 113 S. Ct. 2786, 2796-97 (1993).

[6] Section 904.01, STATS., states: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more

§ 907.02, STATS.;[7] and (3) the evidence will assist the trier of fact in determining an issue of fact, § 907.02. *State v. Walstad,* 119 Wis. 2d 483, 516, 351 N.W.2d 469, 486 (1984). If these requirements are satisfied, the evidence will be admitted.

Moreover, scientific evidence is admissible under the relevancy test regardless of the scientific principle that underlies the evidence. *Id.* at 518-19, 351 N.W.2d at 487. As our supreme court noted in *Walstad*:

> The fundamental determination of admissibility comes at the time the witness is "qualified" as an expert. In a state such as Wisconsin, where substantially unlimited cross-examination is permitted, the underlying theory or principle on which admissibility is based can be attacked by cross-examination or by other types of impeachment. Whether a scientific witness whose testimony is relevant is believed is a question of credibility for the finder of fact, but it clearly is admissible.

*Id.*

However, while Wisconsin confines itself to a determination of relevancy, we are compelled to acknowledge that Wisconsin judges do serve a limited and indirect gatekeeping role in reviewing the admissibility of scientific evidence. Unlike judges in *Frye* and

---

probable or less probable than it would be without the evidence."

[7] Section 907.02, STATS., states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*Daubert* jurisdictions, this role is much more oblique and does not involve a direct determination as to the reliability of the scientific principle on which the evidence is based. For instance, in addition to the statutory requirements, Wisconsin judges may reject relevant evidence if they conclude: (1) the evidence is superfluous, *Walstad*, 119 Wis. 2d at 516, 351 N.W.2d at 486; (2) the evidence will involve a waste of judicial time and resources, *id.*; (3) the probative value of the evidence is outweighed by its prejudice to the defendant, § 904.03, STATS.; (4) the jury is able to draw its own conclusions without it, *Valiga v. National Food Co.*, 58 Wis. 2d 232, 251, 206 N.W.2d 377, 388 (1973); (5) the evidence is inherently improbable, *Peterson v. Peterson*, 126 Wis. 2d 264, 266, 376 N.W.2d 88, 89 (Ct. App. 1985); or (6) the area of testimony is not suitable for expert opinion, *State v. Flattum*, 122 Wis. 2d 282, 289-90, 361 N.W.2d 705, 709-10 (1985).[8] The foregoing

---

[8] In *State v. Flattum*, 122 Wis. 2d 282, 289-90, 361 N.W.2d 705, 709-10 (1985), our supreme court concluded that in the guilt phase of the trial psychiatric testimony regarding a defendant's capacity to form intent is inadmissible for lack of reliability. We note, however, that the *Flattum* court relied on *Steele v. State*, 97 Wis. 2d 72, 294 N.W.2d 2 (1980), in arriving at this conclusion. In *Steele*, the Wisconsin Supreme Court concluded that expert psychiatric testimony regarding a defendant's ability to form intent was not admissible because the state of psychiatric science was not sufficiently advanced to make this determination. *Id.* at 96-97, 294 N.W.2d at 13. Thus, while *Steele* was ultimately grounded on a reliability determination, the court's holding was based upon a public policy determination that this type of psychiatric evidence, like polygraph examinations, *State v. Dean*, 103 Wis. 2d 228, 279, 307 N.W.2d 628, 653 (1981), is not a suitable area for expert testimony. Accordingly, we do not construe *Flattum* to require trial courts to make the type of ad hoc reliability determination envi-

list is not an exhaustive inventory of those grounds upon which the trial court may rely in refusing to admit relevant evidence. However, it demonstrates that although Wisconsin judges do not evaluate the reliability of scientific evidence, they may restrict the admissibility of such evidence through their limited gatekeeping functions.

In this case, Peters contends that the trial court erred because it did not make a direct determination as to the reliability of the statistical evidence. This argument is without merit. Once the relevancy of the evidence is established and the witness is qualified as an expert, the reliability of the evidence is a weight and credibility issue for the fact finder and any reliability challenges must be made through cross-examination or by other means of impeachment. *Walstad*, 119 Wis. 2d at 518-19, 351 N.W.2d at 487. Thus, the trial court was not required to determine that the DNA evidence and the statistics derived therefrom were reliable. Rather, the trial court's obligation was to determine whether the testifying witness was qualified as an expert, whether the evidence was relevant and whether it would assist the trier of fact. That said, we will next determine whether the trial court properly exercised its discretion in admitting the statistical probability evidence.

There is no dispute that Forman, the State's primary DNA witness, was a qualified expert. Forman has a Ph.D. in human variation, anthropology and population genetics and has worked for Cellmark Diagnostics, a DNA identification company, since 1989. Addition-

sioned by *Daubert v. Merrell Dow Pharmaceuticals*, 113 S. Ct. 2786 (1993). Rather, like *Steele*, we construe it as a broad statement of Wisconsin's public policy.

ally, Forman has testified as an expert in population genetics in approximately ninety criminal cases and has substantial experience in the area of molecular biology. Finally, Forman has acted as a contributing author on several papers in the area of population genetics. Based on her background, it is apparent that Forman was sufficiently qualified to testify as an expert in the area of DNA analysis.

Additionally, the evidence was relevant to an issue of fact at trial. Evidence is relevant if it makes a fact that is of consequence to the determination of the action more or less probable. Section 904.01, STATS. Here, Forman testified that the ceiling method of probability calculation was an acceptable means of probability calculation in the absence of a Native-American database and that it adequately accounted for potential subpopulation variances in estimating DNA frequencies. Further, the statistical probability evidence derived from the DNA testing linked Peters' DNA to the DNA gathered from the victim's person and clothing. Accordingly, the statistical evidence was relevant because it made the existence of the fact that Peters perpetrated the crime more probable than it would have been without the evidence.

Further, the probability evidence was necessary to assist the jury in determining the significance of the match between Peters' DNA and the DNA found on the victim. As we previously recognized, the mere fact that a defendant's DNA matches a sample taken from the victim does not establish that the defendant perpetrated the crime. Statistical probability evidence is necessary to determine the likelihood of a coincidental match between the defendant's DNA and the sample taken from the victim's person and clothing. Without statistical evidence, the jury would have been unable to

determine the significance of the DNA match. Accordingly, this evidence was of assistance to the jury.

Finally, we note that while not required under Wisconsin's relevancy test, the trial court determined that the scientific principle underlying the statistical probability evidence was reliable. At the suppression hearing, the trial court heard testimony both from the State's expert, Forman, and Peters' expert, Stanley Sawyer. After weighing this testimony, and apparently relying on the factors articulated in *Daubert*, the trial court concluded that: (1) the methodology underlying the testimony was scientifically valid; (2) the interim ceiling method had been subjected to peer review and publication; and (3) the evidence would assist the jury in arriving at answers to disputed issues of relevant fact. Accordingly, the trial court determined that the statistical probability evidence was admissible.

■

The trial court's decision to admit the DNA evidence was a proper exercise of discretion. The State's primary DNA witness was a qualified expert, the evidence was relevant and it assisted the jury in determining a fact in issue. Moreover, while not necessary under Wisconsin law, the trial court concluded that the evidence was sufficiently reliable to be admitted at trial. Having established this foundation, we conclude that the evidence was properly admitted.

In the interest of clarity, we note that Peters has not advanced any other basis for the suppression of the statistical probability evidence other than its lack of reliability. Therefore, because Peters has raised no other basis for suppression, we need not determine whether an alternative statutory basis existed for the exclusion of this evidence. *See Gegan v. Backwinkel*, 141 Wis. 2d 893, 906, 417 N.W.2d 44, 50 (Ct. App. 1987)

(party must object at trial to preserve argument for appeal).

## EQUAL PROTECTION

Peters next contends that he was denied equal pro-tection of the law in violation of the Fourteenth Amendment[9] to the United States Constitution because the State offered DNA evidence that was based upon a comparison of his DNA to population databases that did not include Native-Americans. Peters, how-ever, raises this argument for the first time on appeal and therefore, has not preserved this issue for appeal. *Id.* at 906, 417 N.W.2d at 50.

However, as an alternative basis for rejecting Peters' claim, we shall address the merits of his equal protection argument. The equal protection clause pro-tects individuals from purposeful discrimination that results from state action. *Washington v. Davis*, 426 U.S. 229, 239 (1976). In this case, the only state action that occurred in the development of the probability statistics resulted from the State's selection of the pri-vate laboratory that did the DNA testing. Peters, however, does not assert nor does he suggest any evi-dence to demonstrate that the State chose this laboratory, as opposed to another laboratory, because it did not have a Native-American population database.

---

[9] The Fourteenth Amendment provides:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, lib-erty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The absence of such evidence precludes the conclusion that the State engaged in purposeful discrimination. Accordingly, because there is no evidence of purposeful discrimination on the part of the State, we reject Peters' contention that he was denied equal protection in violation of the Fourteenth Amendment.

## ADMISSIBILITY OF "OTHER ACTS" EVIDENCE

Peters argues that the trial court erred by admitting evidence that on the day of Sarah's abduction, Peters had contacts with three other teenage girls. The evidence consisted of Peters stalking two teenage girls in a Green Bay mall and approaching a teenage woman as she pushed a baby carriage on the sidewalk. Peters contends that this was other crimes evidence within the confines of *Whitty v. State*, 34 Wis. 2d 278, 292, 149 N.W.2d 557, 563 (1967). Relying on the premise that this is *Whitty* evidence, Peters concedes that the evidence was properly used for the purpose of showing identity. However, he claims that because the contacts with the three other girls were "so dissimilar" to the attack on Sarah, this evidence was not probative of motive, intent or plan and the trial court erred by admitting it for these purposes.

Peters' argument is without merit. *Whitty* dealt exclusively with other crimes evidence. *See id.* Here, however, the evidence relating to Peters' contact with the three other girls was not criminal. Rather, this was evidence of other acts. Accordingly, we shall review the trial court's admission of this evidence in accordance with the standard for admission of other acts evidence under § 904.04(2), STATS.

Whether other acts evidence is admissible is addressed to the trial court's discretion. *State v. Mink*,

146 Wis. 2d 1, 13, 429 N.W.2d 99, 103-04 (Ct. App. 1988). In making this determination, the trial court must apply a two-prong test. First, the trial court must determine whether the evidence fits within one of the exceptions contained in § 904.04(2), STATS. Section 904.04(2) precludes other acts evidence to prove the character of a person in order to show that the person acted in conformity with that character. However, the statute permits the admission of such evidence for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* The grounds for the admission of other acts evidence are not exclusive, but illustrative. *State v. Shillcutt*, 116 Wis. 2d 227, 236, 341 N.W.2d 716, 720 (Ct. App. 1983). Once the court determines that the evidence satisfies one of the grounds for admission, the court must next determine whether the probative value of the evidence is substantially outweighed by any unfair prejudice to the defendant. *State v. Pharr*, 115 Wis. 2d 334, 344, 340 N.W.2d 498, 502 (1983). We will uphold the trial court's admission of other acts evidence as long as the record discloses a reasonable basis for the court's decision. *Id.* at 342, 340 N.W.2d at 501.

In this case, the trial court determined that the evidence of Peters' contacts with three other girls on the day that Sarah was attacked could be used to show motive, intent and plan. This was a proper exercise of discretion. Peters' contact with other juvenile girls hours before the attack on Sarah was highly probative. The contacts were near in time, place and circumstances to Sarah's subsequent abduction and attack and helped furnish the jury with a complete presentation of the facts. *See Shillcutt*, 116 Wis. 2d at 236, 341 N.W.2d at 720 (other acts evidence is admissible to

695

furnish context of the crime and full presentation of the facts). The proximity of these contacts and the circumstances surrounding them are probative of Peters' intent and plan to select a victim for the purpose of the offense that was ultimately committed. Further, this evidence was probative of Peters' motivation to obtain sexual gratification through the predation of teenage girls, as reflected by his undertaking of a series of progressively more invasive acts against such girls.

Trial courts, however, have an obligation to exclude other acts evidence if it subjects the defendant to unfair prejudice that outweighs its probative value. Section 904.03, STATS. Here, the trial court did not expressly compare the probative value of the evidence against any unfair prejudicial effect. We may independently review the record, however, to determine whether the trial court properly exercised its discretion. *Pharr*, 115 Wis. 2d at 343, 340 N.W.2d at 502.

Because of the probative nature of this evidence, it necessarily caused prejudice to Peters. However, this prejudice did not rise to such a level that it could be categorized as unfair. As we previously recognized, the other acts evidence was highly probative. Balancing this highly probative evidence against the possibility of unfair prejudice, we note that the evidence of Peters' contact with the three girls was not criminal conduct. Further, in neither case did Peters touch, threaten, entice or attempt to abduct these girls. Thus, while this evidence was probative, it did not necessarily lead to the conclusion that Peters had the propensity to commit the charged crimes. Based on these facts, we conclude that the prejudice this evidence caused to

Peters did not outweigh its probative value and affirm the trial court's decision to admit the evidence.

## SENTENCING DECISION

Although it is unclear from his brief, it appears that Peters next contends that the trial court sentenced him based upon improper information contained in the presentencing report. We do not agree. Peters did not present any evidence to support his claim that the sentencing report contained improper information. Further, Peters had the opportunity to review and contest the information in the presentence report that he believed to be improper. Once given this opportunity, it was within the trial court's discretion to determine the weight, if any, to be given the report. *See Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457, 461 (1975) (factors to be considered in sentencing lie within the sound discretion of the trial court). To the extent that the trial court relied upon the report, we conclude that it properly exercised its discretion.

Further, even assuming the information was improper, the trial court did not rely upon it. Prior to sentencing, the trial court specifically noted that the presentence report was not binding on its decision and expressly stated: "I don't have to rely on the presentence investigation" to conclude that Peters is a very dangerous man. Thus, Peters suffered no prejudice from the presentence report and we reject his argument to the contrary.

Finally, Peters contends that the sentence was unduly harsh. The trial court imposed the maximum consecutive sentences for each of the offenses for which Peters was convicted. These sentences were enhanced

due to Peters' repeater status, thus resulting in a 185 year term of imprisonment. There is no dispute that the sentences were within the statutory limits.

Sentencing lies within the sound discretion of the trial court, and our review is limited to whether the trial court misused its discretion. *State v. Larsen*, 141 Wis. 2d 412, 426, 415 N.W.2d 535, 541 (Ct. App. 1987). We will not reverse a trial court's sentence unless it is "so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." *Ocanas*, 70 Wis. 2d at 185, 233 N.W.2d at 461.

Based on the brutality of Peters' conduct and the outrageous nature of his attack on a fifteen-year-old girl, we cannot conclude that the trial court's sentence was so excessive as to shock the public's conscience. Peters' conduct, which apparently occurred while he was on parole for stabbing a bouncer, represented a cruel, unprovoked and despicable act of violence. There are some defendants who commit acts of violence so heinous that they should never be permitted to return to a free society. Peters is such a defendant. Accordingly, we conclude that the trial court properly exercised it sentencing discretion.

*By the Court.*—Judgment affirmed.